UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DERMSOURCE, INC.,

                                Plaintiff,

            -against-

CITYMEDRX, LLC, ROBERT ABAEV, and DAVID
ABAEV,

                               Defendants.
----------------------------------------------------------------X

**Case No.: 2:23-cv-281-**

**COMPLAINT**

Plaintiff DermSource, Inc. ("DermSource" or "Plaintiff"), by its attorneys Milman Labuda Law Group PLLC, as and for its Complaint against Defendants CityMedRx, LLC (hereinafter "CityMed" or the "Corporate Defendant"), Robert Abaev (hereinafter "Robert"), and David Abaev (hereinafter "David") (Robert and David collectively hereinafter the "Individual Defendants") (the Corporate Defendant and the Individual Defendants collectively hereinafter the "Defendants"), hereby alleges as follows:

## NATURE OF THE CASE

1.     This is an action for damages & injunctive relief related to Defendants' improper poaching of Plaintiff's employee and the misappropriation of Plaintiff's confidential information and trade secrets resulting in their violation of or engagement in: (i) the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (ii) the federal Wiretap Act, 18 U.S.C. § 2520; (iii) the Computer Fraud & Abuse Act ("CFAA"), 18 U.S.C. § 1030; (iv) misappropriation of trade secrets; (v) unfair competition; (vi) tortious interference with contractual relations, business relations, and prospective economic advantage; (vii) unjust enrichment; (viii) breach of contract; (ix) conversion; (x) civil conspiracy; and (xi) breach of implied covenant of good faith and fair dealing.

2.      Defendants' diabolical scheme to leech off of Plaintiff's business causing Plaintiff's decimation must be stopped.

3.      Specifically, Defendants must be prevented from utilizing Plaintiff's confidential information and trade secrets stolen by the Defendants who have poached Plaintiff's key employee to compete against Plaintiff and unlawfully intercepting, wiretapping, and eavesdropping Plaintiff's camera system all of which is being done to decimate Plaintiff's business.

4.      In addition to being enjoined from their conduct which has decimated and threatens to shutter Plaintiff's business, Defendants must pay for damages for the harm they have caused to Plaintiff's business.

## **PARTIES**

5.      DermSource was at all times relevant and remains a corporation duly incorporated under the laws of the State of New York with its principal place of business in Nassau County, New York.

6.      DermSource is a Group Purchasing Organization ("GPO") representing over eight hundred (800) independent retail pharmacies.

7.      Yuriy Davydov ("Mr. Davydov") is DermSource's sole shareholder, Chief Executive Officer, & President.

8.      CityMed is and was at all times relevant a limited liability company duly organized under the laws of the State of New York with its principal place of business in Queens County, New York.  It is a pharmaceutical wholesaler which has had a vendor relationship with DermSource since DermSource's inception.

9.      Robert and David are the principals and/or members of CityMed, and they each reside in the State of New York within the County of Queens.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 given that Plaintiff pursues claims under the DTSA and the federal Wiretap Act, both of which are federal laws.

11.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims against Defendants because they are part of the same case or controversy and arise under a common nucleus of operative facts.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district and each of the Defendants reside in this district.

## FACTS

13.     Beginning with Mr. Davydov's acceptance into St. John's University in Jamaica, NY for his Doctorate of Pharmacy degree in 2006, he has been actively vested and dedicated to the pharmacy industry, as a New York State licensed pharmacist from 2011 to the present.

14.     DermSource was duly incorporated in July 2018, and Mr. Davydov has been its sole shareholder, President, and Chief Executive Officer ("CEO") since its inception.

15.     Since its incorporation, DermSource invested in, developed, created, and launched the first-to-market online purchasing platform exclusively dedicated to the purchase of discounted dermatological pharmaceutical products, serving retail pharmacies nationwide in a highly competitive field of wholesale distributors.

16.     In 2017, Mr. Davydov opened a sales and marketing organization which focused on the dermatology market, serving and maintaining relationships with all stakeholders in the pharmacy industry, including pharmacies, practitioners, wholesalers, and manufacturers.

17.     Most recently, in 2023, Mr. Davydov obtained a registered pharmacist license in the State of Pennsylvania.

18.     For over a decade, Mr. Davydov and his team of employees have built relationships in the dermatological pharmaceutical channels of distribution and, in 2018, decided to launch a new business whose model serves as a group purchasing organization dedicated to discounted dermatology products available to independent retail pharmacies in the United States, and with a mission to help the independent pharmacies stay in business.

19.     DermSource is a Group Purchasing Organization ("GPO") representing over eight hundred (800) independent retail pharmacies.

20.     A GPO is  an entity that helps healthcare providers — such as independent retail pharmacies — realize savings and efficiencies by aggregating purchasing volume and using that leverage to negotiate discounts with manufacturers, distributors and other vendors.

21.     As a group purchasing organization, DermSource obtains – as customers – independent retail pharmacies and it utilizes wholesalers – such as CityMed – to fulfill the needs of the independent retail pharmacies.

22.     DermSource collects a three percent (3%) origination fee on all orders procured from the customers it sources.

23.     On top of sourcing dermatological pharmaceuticals at affordable pricing, DermSource distinguishes itself from the competition by the relationships it has built and the accompanying services it provides to its customers – independent retail pharmacies.

24.     For example, DermSource offers its customers advise on market trends, brand awareness, new product offerings, and profitability – adding to their bottom line.

25.     Since launching and exhibiting DermSource at the National Community Pharmacists Association's annual event held in Boston in 2018,[1] the DermSource brand represents and publicizes "truth in pricing" and "purchase power" for the independent retail pharmacy – a brand that captured the attention of and engaged over eight hundred (800) pharmacies.

26.     DermSource also introduced an online group purchasing platform with highly discounted dermatology products and made it available to independent retail pharmacies.

27.     DermSource employed a single key employee at inception, who Mr. Davydov educated, mentored, and inspired in the field of pharmaceuticals, and who became instrumental in DermSource's growth to its customer base which, as of today, has approximately eight hundred (800) members.

28.     Prior to being employed by DermSource, this key employee had no relevant background or experience in the dermatology or pharmaceutical industry.

29.     DermSource trained the key employee in every single aspect of its business, including sales strategy for onboarding customers, business acumen, customer service skills, and administrative skills at DermSource.

30.     In fact, DermSource expended substantial resources in, for example, routinely flying this key employee out of the state to personally engage with local pharmacy owners and/or operators, attend and exhibit at relevant trade shows, and to build brand awareness in, *i.e.*, Pennsylvania, Massachusetts, Texas, Kentucky, Florida, and Virginia, among other States.

31.     From its inception until January 2021, DermSource utilized CityMed, among others, as a wholesaler to fulfill orders for DermSource's independent retail pharmacy customers.

---

[1] See https://www.youtube.com/watch?v=zra5WUvAzHU (last viewed on January 11, 2023).

32.     DermSource was responsible for obtaining these independent retail pharmacies as customers and the wholesalers, such as CityMed, would fulfill the needs of the independent retail pharmacies that DermSource brought to the wholesalers.

33.     In exchange for DermSource sourcing these customers, wholesalers such as CityMed paid DermSource a fee of three percent (3%) of the revenue on any orders placed by the customers DermSource procured.

34.     In or about January 2021, however, DermSource and CityMed entered into an exclusive agreement under which DermSource utilized CityMed to fulfill all orders sourced by DermSource.

35.     Indeed, on January 7th, 2021, CityMed entered into a Joint Marketing and Sale of Business agreement with DermSource.  Under this agreement, DermSource used its purchasing platform, DermSource.com, to submit purchase orders *exclusively* to CityMed to be filled on behalf of its member pharmacies, whereas prior thereto, CityMed was *one of several* vendors of DermSource.  The agreement specifically provided, among other things, that no material changes to the business operations of the respective parties can be made without the other party's consent.

36.     Specifically, the agreement provides, in ¶ 6, titled "Certain Acts Require Mutual Consent," and specifically states: "During the term of this Agreement neither Party shall take any of the following actions without the consent of the other Party: … (c) any material change in the operations of the Business."

37.     This agreement was premised on a business concept of consolidating DermSource's and CityMed's collective services in order to present a first-to-market duo that, together, as a pharmaceutical wholesaler and dermatology-specialized-GPO, would be marketed and sold as a single enterprise.

38.     In fact, the parties were successful in marketing themselves to a conglomerate in the pharmaceutical industry and achieved a valuation of 0.75X revenue, which amounted to approximately $24 million for their combined businesses.  Regrettably, the parties were unable to consummate the transaction with the conglomerate for reasons outside of their control.

39.     However, the foregoing anticipated sale was achieved in large part due to the parties' agreement to work exclusively with each other, and to require the consent of each other prior to making any material change in the operations of the parties' respective businesses.

40.     The parties therefore intended to renew their January 7, 2021 agreement which, by its terms, expired on December 31, 2022, in order to attempt to find another buyer and complete a similar – or even better – transaction.

41.     The parties thus met on December 5, 2022 at DermSource's headquarters in New Hyde Park, New York, to negotiate the terms of their agreement, and did so with the understanding that – pending any such new agreement – the parties would continue to work together, in good faith, as they did for several years.

42.     However, CityMed began to engage in bad-faith bargaining during the parties' negotiations.  For example, during these negotiations, DermSource offered to increase shared revenue between the parties by introducing an additional wholesaler to service DermSource customers in the approximately sixteen (16) States that CityMed is not licensed in (and is thus unable to serve) that DermSource could service through other wholesalers, since CityMed is not licensed in those States, despite the fact DermSource could source customers in those States.

43.     As a business partner, DermSource offered to CityMed in good faith fifty percent (50%) of any revenue generated from any sales to any such additional wholesaler; this proposal undeniably posed a win-win to both DermSource and CityMed.

44.     CityMed not only rejected this proposal; it countered that they seek a $1-million liquidated damages provision for any violation of the exclusivity provision of their agreement.

45.     In addition, and as another example, in January 2021, pursuant to CityMed's agreement with DermSource, CityMed agreed to pay DermSource a three percent (3%) fee from CityMed's overall revenue – regardless of its source, i.e., procured by DermSource or not – in exchange for DermSource's commitment to appoint CityMed as their exclusive wholesaler which provided CityMed with all DermSource-customer-generated invoices and sales.

46.     CityMed now sought to wriggle out of this financial arrangement even though DermSource was primarily and materially responsible for its explosive growth in revenue.

47.     Indeed, during the December 2022 negotiations, after working with DermSource members exclusively for two (2) years and benefitting from their exclusive relationship, CityMed puzzlingly proposed reducing DermSource's fees, then a percentage of overall revenue, to fees based solely on a percentage of sales sourced by DermSource's online platform.

48.     CityMed further sought to remove any obligation to pay a fee if a DermSource member called CityMed directly to place an order, as opposed to placing one on DermSource's platform.

49.     DermSource was baffled by these requested changes to the parties' agreement, which sought to reap the benefit of an exclusive arrangement in perpetuity while paying for same for only two (2) years, with no upside to DermSource.

50.     Then, in the midst of the December 2022 negotiations, DermSource's key employee suddenly gave two (2) weeks' notice that he was leaving the employ of DermSource, and stated in his December 20, 2022 resignation notice that DermSource had his cooperation for any assistance needed with the transfer of his responsibilities during any transition period.

51.     However, while the key employee agreed to return all company property and information as he was required to, but he failed to provide significant information about DermSource customers sourced by and through his employment with DermSource; more specifically, Plaintiff later found out that the key employee altogether failed to enter that information into the DermSource's customer relationship management ("CRM") sales system, which documents all communication and documentation with its customers.

52.     Specifically, the key employee took with him and failed to provide to DermSource the identity of each pharmacy's individual point of contact and preferred method of communication, such as the customers' personal cell phone number, unlisted telephone number, and/or email address; information that is not readily available to the public.

53.     Plaintiff's key employee had and obtained specific contact information that is not public, i.e., cellular phone numbers of the individual responsible for purchasing at the independent retail pharmacy customers, purchasing habits, customer preferences, and similar information.  This information belongs to DermSource.

54.     Moreover, and crucially, the key employee refused, despite due demand, to contact DermSource's customers and inform them of the transition to ensure continuity.

55.     Indeed, in a foreboding email just a week after his resignation, on December 27, 2022, the key employee unexpectedly and shockingly stated that he felt "uncomfortable" providing DermSource with its own customer information and abruptly left his employ prior to the two (2) week period.  Shortly thereafter, but prior to the official termination date of their agreement on December 31, 2022, CityMed – without warning – ceased fulfilling orders from DermSource, effectively cutting DermSource out of its business  completely while continuing to service the customers DermSource sourced in breach of the agreement!

56.     Defendants' poaching of Plaintiff's key employee was a violation of the parties' agreement because it constituted a material change in operations, and Defendants did not seek Plaintiff's consent in recruiting its key employee.

57.     Defendants poached DermSource's key employee in violation of their agreement and engaged in this conduct to deprive DermSource of the contractually agreed-upon benefit it expected to receive from CityMedRx, alienate DermSource from its customers, and split the proceeds of their efforts between themselves, all in an effort to cut DermSource out of its business and destroy the brand DermSource worked so hard for over half a decade to build it into a multimillion-dollar-valued-company.

58.     DermSource's business model, customer lists, contact information and preferences, information related to our revenues and profit margins, and the related information Plaintiff's key employee obtained during his employment with DermSource are confidential and proprietary, and took great costs and efforts to create, including years of developing relationships with customers.

59.     Discovery, which Plaintiff respectfully requests this Court expedite, will likely uncover that Defendants have inappropriately poached DermSource's key employee, in violation of the parties' January 7, 2021 agreement not to make any material changes in operations without the consent of the other party, in order to obtain from him DermSource's confidential information and trade secrets which he stole.

60.     Indeed, DermSource has discovered that its key employee failed to enter specific customer information in its database as required according to his duties, and that DermSource's key employee instead kept this information to himself, depriving DermSource of its trade secrets.

61.     It gets worse.

62.     To add insult to injury, following CityMed's abrupt departure, DermSource discovered that its camera system, which records audio and video, had been hacked into by Plaintiff's key employee at the behest of the Defendants to illegally record and intercept DermSource's internal communications.

63.     Upon information and belief, both during and after the key employee's employ, Defendants – directly and indirectly – logged in hundreds of times in order to listen in on conversations that Plaintiff's principals had concerning business strategy in light of CityMed's abrupt end to its relationship with DermSource.

64.     Defendants' conduct is as appalling as it is abominable.  More importantly, Defendants' conduct constitutes a violation of the DTSA, the federal Wiretap Law, and related state law common claims for misappropriation of trade secrets and unfair competition, as well as, among other things, a breach of the parties' agreement.

65.     Robert and David personally engaged in the foregoing conduct and, as such, should be held personally liable for coaxing Plaintiff's key employee to provide them intercepted oral communications from an illegal wiretap and, separately, for surreptitiously recruiting and poaching Plaintiff's key employee in violation of the parties' agreement while pretending to negotiate in good faith an extension of the parties' agreement.

66.     CityMed is currently benefitting from the relationships DermSource worked hard for since 2018 to develop and source which CityMed stole from DermSource.  Plaintiff's business model, its customer lists, contact information and preferences, information related to its revenues and profit margins, and the related information DermSource's key employee obtained during his employment are confidential and proprietary, and took great costs and efforts to create, including years of developing relationships with customers and the DermSource brand.

67.     Plaintiff, by and through Mr. Davydov and his team, went through painstaking efforts, time, and money to build their business and brand to what it is today.

68.     Plaintiff has spent the last four years marketing its services, developing its brand, and cultivating relationships with its customers and contacts in the industry, many of whom were customers of DermSource from its inception.

69.     Moreover, DermSource's key employee only learned of Plaintiff's customer's preferences, and *how* to learn of same, while employed at DermSource, and Defendants have sought to exploit this information through improper means.

70.     Plaintiff's carefully curated customer preferences and customer relations are vital to its business; possession of that information, which Defendants misappropriated in contravention of their agreement with Plaintiff and in violation of the law.

71.     This confidential information and these trade secrets provided Plaintiff a unique competitive advantage in the dermatological pharmaceutical industry, a competitive advantage it has been stripped of by Defendants' unlawful acts.

72.     Plaintiff took many reasonable measures to keep its confidential information secret, including restricting access of this information only to its key employee, who was required to maintain it in a secured CRM program protected by firewalls, other appropriate safeguards, and related resources.

73.     In addition, the DermSource office is secured with video surveillance, keyboard office entry (as its office is not open to the general public), and Plaintiff's key employee had his own private office with his computer password-protected. Indeed, the entire office computer network is protected by a firewall.

74.     The confidential information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

75.     This confidential information is related to services used in and intended for use in interstate or foreign commerce because Plaintiff has its key employees travel out of the State of New York to the States of Pennsylvania, Florida, Texas, Virginia, and other States in the regular course of its business.

76.     Defendants knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, and details about customers – were acquired by improper means.

77.     This is evidenced by Defendants' sudden bad faith negotiations and abrupt end to their long-standing relationship with DermSource.  It is also evidenced by their use of illegally intercepted oral communications consisting of DermSource's internal business strategy before, during, and after the December 2022 negotiations.

78.     Upon information and belief, Defendants bribed Plaintiff's key employee in order to poach him and have him steal DermSource's confidential information and trade secrets to deprive Plaintiff of its contractually agreed-upon benefit with its customers.

79.     The unauthorized acts of Defendants in using critical confidential information to cut DermSource out of its business is unlawful.

80.     There was no other way to obtain this information and Defendants used it as a "roadmap" and "step by step manual" to establish their operations to improperly independently derail the Plaintiff's business.

81.     Plaintiff's trade secrets and confidential information that Defendants misappropriated through the former key employee of DermSource provided Defendants with the ability to duplicate operational, service, and development techniques that DermSource has spent years establishing; meanwhile, Defendants gained access to information through subterfuge that they would have no other way of obtaining.

82.     Defendants misappropriated such confidential and trade secret information by engaging in theft and bribery; no permission was given to Defendants to utilize Plaintiff's customer lists, customer preferences, financial information, and details about DermSource's customers for any purpose except for the benefit of DermSource.

83.     It is obvious from Defendants' brazen tactics that they are actively engaged in a scheme to plunder and destroy the company Mr. Davydov spent years building.

84.     A significant number of Plaintiff's customers have been solicited directly by Defendants using Plaintiff's trade secrets and confidential information.

85.     Immediate injunctive relief and a permanent injunction is necessary to prevent Defendants from destroying the customer relationships, brand, and goodwill that DermSource has spent years building, from profiting on a business which they stole from DermSource, and causing further imminent and irreparable financial harm to DermSource.

86.     In addition to securing the return of its misappropriated information to it by Defendants and enjoining them from engaging in any further unlawful conduct, it is essential that DermSource be permitted to forensically examine the Defendants' email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of Defendants' unlawful scheme to steal DermSource's customers.

## AS AND FOR ITS FIRST CAUSE OF ACTION
**(Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 – All Defendants)**

87. DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

88. Defendants' actions, as set forth herein, constitute misappropriation under the DTSA, 18 U.S.C. § 1836.

89. Defendants possess trade secrets and confidential information belonging to Plaintiff, including the identity of all of its customers, contact information, and all details related to customers, including *inter alia*, their preferences and pricing, profit margins, in addition to private and confidential financial information.

90. DermSource made and makes reasonable efforts to maintain the secrecy of this information including limiting its disclosure to the key employee who stole it and provided it to Defendants, who prompted Plaintiff's key employee to do so in violation of their agreement with Plaintiff.

91. Defendants had no authority to utilize confidential information and trade secrets of DermSource.

92. The confidential information and trade secrets belonging to Plaintiff that Defendants possess derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

93. Indeed, Defendants utilized this very information as a road map to open a competing business and to unfairly compete against DermSource in dastardly fashion.

94. Defendants knew that this information contained confidential information and trade secrets belonging to DermSource.

15

95.     Defendants have no right to retain or use any of DermSource's trade secrets or other confidential and proprietary information due to their illegal conduct.

96.     Upon information and belief, Defendants are retaining and using DermSource's confidential information and trade secrets to compete with DermSource.

97.     DermSource did not consent to Defendants' use of the information as set forth above.

98.     At all relevant times, Defendants knew that the information obtained by them contained Plaintiff's proprietary trade secrets that they had no right to receive and could not receive absent their improper acts.

99.     Defendants' conduct thus constitutes knowing, willful, and malicious misappropriation.

100.    Defendants have used Plaintiff's confidential information and trade secrets to sell, through interstate commerce, services that compete with the services that Plaintiff markets, causing substantial loss of sales to Plaintiff and damage to its relationships with its clients and the potential obliteration of the DermSource brand.

101.    Defendants have wrongfully acquired and used Plaintiff's confidential information and trade secrets and continue to do so, without the express or implied consent of Plaintiff, for Defendants' own benefit and the benefit of others.

102.    The public policy in favor of protecting Plaintiff's interest in maintaining its trade secrets outweighs any interest Defendants could have in using Plaintiff's confidential information and trade secrets.

103.    As a direct and proximate result of Defendants' misappropriation of Plaintiff's confidential information and trade secrets, Plaintiff has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the loss of its brand recognition and goodwill with its clients, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are restrained from their continued misappropriation of confidential information and trade secrets.

### AS AND FOR A SECOND CAUSE OF ACTION
### Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.* – All Defendants)

104.    DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

105.    DermSource operates its business in interstate commerce in New York, New Jersey, Pennsylvania, and other states, and the trade secrets misappropriated by Defendants are related to, and intended for use in, interstate commerce.

106.    As set forth above, Defendants improperly acquired Plaintiff's trade secrets, including information regarding Plaintiff's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except its key employee who was obligated to keep this information confidential.  The aforementioned information qualifies as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

107.    The misappropriated documents concern Plaintiff's operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

108.     Furthermore, Plaintiff has taken reasonable measures to keep such information secret by, among other things, limiting highly sensitive information to the key employee who stole it at the behest of the Defendants.

109.     The trade secrets misappropriated by Defendants include those which required substantial resources, time, and investment by Plaintiff to create and/or develop, and thus derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information.

110.     Defendants' misappropriation of Plaintiff's trade secrets has caused Plaintiff to suffer harm, including but not limited to the loss of clients, loss of reputation, damage to their brand, and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

111.     This harm cannot be adequately remedied at law and requires permanent injunctive relief.   Plaintiff will suffer irreparable and imminent harm in the absence of a permanent injunction; Defendants' continued misappropriation of Plaintiff's trade secrets and failure to return Plaintiff's documents containing Trade Secrets, including Plaintiff's customer information, will cause Plaintiff further loss of market share.

112.     This imminent injury is neither remote nor speculative, because Plaintiff has already been harmed in precisely this manner by Defendants' misappropriation and use thereof, and will continue to be irreparably harmed in the absence of a permanent injunction.

113.     Defendants will not suffer harm from the rightful return of Plaintiff's proprietary information and trade secrets, and will not be prevented from conducting their ordinary business by lawful means.

114.    Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiff's expense.  The ongoing, continuing and future harm to Plaintiff cannot be adequately remedied at law and requires permanent injunctive relief.

115.    The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating Plaintiff's Trade Secrets.

116.    Accordingly, Plaintiff is entitled to an injunction, pursuant to 18 U.S.C. 1836(b)(3)(A), enjoining Defendants from continuing to use Plaintiff's trade secrets, in order to prevent continued actual and threatened misappropriation of Plaintiff's trade secrets, and requiring Defendants to return and/or destroy the trade secrets improperly accessed and retained by Defendants, pursuant to 18 U.S.C. 1836(b)(3)(A)(ii).

## AS AND FOR A THIRD CAUSE OF ACTION
### (Wiretap Act – All Defendants)

117.    DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

118.    Plaintiff asserts this cause of action against Defendants pursuant to the Electronic Communications Privacy Act ("Wiretap Act"), 18 U.S.C. § 2510, *et seq.*

119.    Through their listening in on conversations Plaintiff's principals had using Plaintiff's camera system, which they obtained access to by and through Plaintiff's key employee, Defendants intentionally intercepted or endeavored to intercept oral and electronic communications transmitted to, from, or in the proximity of Plaintiff's office, including communications that Plaintiff had concerning its business strategy in light of CityMed's unlawful termination of its agreement with Plaintiff.

120.     Upon information and belief, Defendants disclosed or endeavored to disclose among their managers and employees the content of the oral or electronic communication that they unlawfully intercepted, wiretapped, eavesdropped or otherwise obtained through the camera system inappropriately accessed by Plaintiff's key employee.

121.     Upon information and belief, Defendants used or endeavored to use the content of the oral or electronic communication that they unlawfully intercepted, wiretapped, eavesdropped or otherwise obtained through the camera system illegally accessed by Plaintiff's key employee.

122.     Defendants utilized the information they unlawfully intercepted, wiretapped, eavesdropped or otherwise obtained through the camera system to compete against Plaintiff thereby causing damages to Plaintiff as Plaintiff lost goodwill and customers as the result of Defendants' unlawful conduct.

123.     Defendants' conduct was a violation of the Wiretap Act, and Section 2520 of the Wiretap Act provides for civil liability for violations of the Wiretap Act.

124.     The statute provides, in relevant part, that:

>  a.  In general.  … any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity … which engaged in that violation such relief as may be appropriate.
>
>  b.  Relief.--In an action under this section, appropriate relief includes--
>  (i) such preliminary and other equitable or declaratory relief as may be appropriate;
>  (ii) damages under subsection (c) and punitive damages in appropriate cases; and
>  (iii) a reasonable attorney's fee and other litigation costs reasonably incurred.

c. <u>Computation of damages.</u>—
(i) In any other action under this section, the court may assess as damages whichever is the greater of--
 (a) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or
 (b) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000

125. Plaintiff is entitled to recover its damages, in an amount to be determined, resulting from Defendants' intentional interception, use and/or disclosure of communications.

126. Plaintiff is entitled to statutory damages of $100.00 per day for each day that Defendants violated the Wiretap Act or $10,000.00, whichever is greater.

127. Plaintiff is entitled to punitive damages, in an amount to be determined, for Defendants' egregious, malicious and oppressive use of Plaintiff's own camera system to intentionally and specifically intercept, monitor and/or record, among other things, communications between and among Plaintiff's principals using a remote device such as an iPhone.

128. Plaintiff is entitled to the recovery of their attorney fees and costs of this litigation.

129. Plaintiff is also entitled to a preliminary injunction requiring the surrender of Defendants' electronic devices that were used, or could have been used, to access the information, data, and communications that were being intercepted, recorded, or otherwise captured by camera system.

130. Defendants' electronic devices must be surrendered so as to ensure that all information, data and communications that were intercepted, recorded or otherwise captured by the camera system they utilized to obtain intercepted, wiretapped, eavesdropped or otherwise improperly obtained information has been destroyed.

131.     Plaintiff is similarly entitled to a declaration that Defendants' actions alleged herein violated the Wiretap Act.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Computer Fraud & Abuse Act – All Defendants)**

132.     DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

133.     Plaintiff's computer systems were at all relevant times used in interstate commerce and communication and are thus "protected computers" under 18 U.S.C. § 1030(e)(2).

134.     Upon information and belief, in violation of 18 U.S.C. § 1030(a)(4), Defendants have deliberately and without authorization accessed Plaintiff's computers for the purpose of misappropriating its trade secrets.

135.     The access of Plaintiff's computers was unauthorized.  Indeed, DermSource's former key employee, who has begun working for Defendants, was separated from his employment with Plaintiff at the time Plaintiff's camera system was accessed, and has provided Defendants with access to the camera system without authority and has otherwise exceeded the scope of authorized use of such computer and software in violation of 18 U.S.C. § 1030(a)(4).

136.     Upon information and belief, Defendants knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, recklessly and intentionally caused damage without authorization, and/or intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. §§ 1030(a)(5)(A)-(C).

137.     By reason of the foregoing, Plaintiff was damaged in an amount to be proved at trial, but well in excess of the statutorily required minimum in any one (1) year period.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Misappropriation – All Defendants)

138.    DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

139.    Defendants' actions, as set forth herein, constitutes misappropriation under New York law.

140.    Defendants currently possess information belonging to and used in the operation of DermSource's business, which information constitutes confidential, proprietary and trade secret information under New York law.

141.    Such information was developed by DermSource through great effort and expense, in terms of manpower, time, and costs, and is extremely valuable to DermSource, as it is crucial to the operation of its business, cannot  be easily acquired or duplicated by others, and, if made available to others, would enable competition with DermSource to its detriment.

142.    DermSource makes reasonable efforts to maintain the secrecy of this information including limiting its disclosure to those who are key employees of DermSource.

143.    Upon information and belief, Defendants knowingly and improperly obtained and used such trade secrets and confidential information for their own benefit.

144.    The improperly retained information constitute trade secrets and Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and with the willful and malicious intent to injure DermSource's business and the DermSource brand.

145.    As a result, DermSource has suffered direct and consequential damages, and is entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Unfair Competition – All Defendants)**

146.     DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

147.     Through Defendants' misappropriation of Plaintiff's confidential trade secrets, Defendants have stolen customers and poached employees from DermSource.

148.     As a result of Defendants' use of the trade secrets they bribed employees to obtain a competitive advantage against Plaintiff, and as such, Defendants have caused economic damages to DermSource along with diminishing its goodwill.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**(Tortious Interference – All Defendants)**

149.     DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

150.     Plaintiff has entered into valid written agreements with its clients, customers, and employees concerning its business.

151.     Defendants were at all relevant times aware of these agreements between Plaintiff and its clients, customers, and employees.

152.     Upon information and belief, Defendants intentionally provided financial incentives in the form of cash payments to Plaintiff's key employees to induce them to work for Defendants, and – in turn – induce the key employees to provide Defendants with Plaintiff's confidential information and trade secrets in violation of the law.

153.     Defendants' conduct in bribing Plaintiff's key employee is a crime, codified in New York's Penal Law at §§ 180.03 and 180.00 as Commercial bribery.  Similarly, Defendants' conduct in wiretapping is also illegal.

154.    Defendants knew that it was illegal to engage in bribery to solicit Plaintiff's employees; Defendants' conduct has caused Plaintiff to lose sales as well as cause injury to Plaintiff's brand and reputation with its customers.

155.    As a consequence of Defendants' acts to steal clients, customers, and employees of DermSource, it has been injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.  Defendants' conduct was intentional, willful, and malicious, thus justifying the award of punitive damages and/or exemplary damages.

### AS AND FOR A EIGHTH CAUSE OF ACTION
#### (Unjust Enrichment – All Defendants)

156.    DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

157.    Plaintiff has invested substantial time, money, and effort into developing and maintaining its confidential information and trade secrets in growing its customer base, promoting its brand, and providing services to its members.

158.    Defendants have used and continue to use Plaintiff's confidential information to compete with Plaintiff and funnel Plaintiff's business opportunities away from Plaintiff to Defendants.  As a result of Defendants' use of Plaintiff's confidential information and trade secrets, Defendants have all been enriched at Plaintiff's expense by, among other things, receiving substantial revenues from sales of pharmaceutical products that compete with Plaintiff's services without bearing the expense and risk of identifying the services and developing the clients, customers, marketing plans, and materials necessary to achieve the sales.

159.     As a consequence of Defendants' acts to steal customers of DermSource, DermSource has been injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Breach of Contract – Defendant CityMedRx)

160.     DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

161.     The parties entered into an agreement whereby they committed to operate exclusively with each other in order to market and sell the respective companies.

162.     Among other things, the parties agreed to not make any material changes in their operations without the consent of the other party.

163.     Plaintiff performed under the agreement.

164.     However, during the term of the agreement, Defendants breached the agreement by poaching a key employee to obtain Plaintiff's confidential information and trade secrets in order to cut DermSource out of its contractually agreed-to bargain.

165.     As a result of the Defendants' combined, concerted, and continued efforts, Plaintiff was, is, and continues to be damaged for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

## AS AND FOR AN TENTH CAUSE OF ACTION
### (Conversion – All Defendants)

166.    DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

167.    Plaintiff has a possessory right and legal ownership to the confidential information and trade secrets referenced herein.

168.    Defendants exercised unauthorized dominion over Plaintiff's confidential information and trade secrets.

169.    Defendants willfully exercised unauthorized dominion over Plaintiff's confidential information and trade secrets to the detriment of Plaintiff.

170.    Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets was and is to the exclusion of Plaintiff's rights.

171.    Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets constitutes conversion.  Defendants have thus committed the tort of conversion under New York common law.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Civil Conspiracy – All Defendants)

172.    DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

173.    Defendants conspired with each other for an unlawful purpose, to wit: obtaining Plaintiff's confidential information and developing a business to compete with Plaintiff using Plaintiff's confidential information obtained by the illegal act of wiretapping.

174.    Defendants have entered into a civil conspiracy to engage in, *inter alia*, misappropriation, unfair competition, unjust enrichment, and tortious interference with contract.

175.     Defendants each agreed to this common goal.

176.     Defendants acted in concert with the specific object of harming Plaintiff for their own personal gain.

177.     Each Defendant performed an overt act in furtherance of the conspiracy.

178.     The unlawful alleged herein, including acts directed into the State of New York, were committed in furtherance of that conspiracy.

179.     As a result of the Defendants' combined, concerted, and continued efforts, Plaintiff was, is, and continues to be damaged.

180.     As a consequence of Defendants' acts to steal customers of DermSource, Plaintiff has been injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

### AS AND FOR A TWELFTH CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith & Fair Dealing – All Defendants)**

181.     DermSource incorporates by reference each of the foregoing allegations as though fully set forth herein.

182.     The implied covenant of good faith and fair dealing embraces a pledge that neither party to a contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

183.     Put another way, reflects an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of entry, and which therefore was not resolved explicitly by the parties.

184.    Defendants' conduct in refusing to honor its agreement, poaching Plaintiff's key employee in violation of the agreement, and engagement in criminal conduct to secure an opportunistic advantage before, during, and after negotiations concerning the agreement breached the implied covenant of good faith and fair dealing implicit in the parties' agreement.

185.    Defendants acted with malice and in bad faith solely to further their own economic interest to the extreme detriment of Plaintiff and its rights.

186.    By reason of the foregoing, Plaintiff has suffered damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

187.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, DermSource hereby demands a trial by jury on all issues so triable in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor as against Defendants as follows:

a.    Compensatory damages for misappropriation of DermSource's goodwill, misappropriation and unfair competition, violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, Wiretap Act, 18 U.S.C. § 2520, Computer Fraud & Abuse Act, 18 U.S.C. § 1030, tortious interference with contract, business relations, and prospective economic advantage, unjust enrichment, breach of contract, and civil conspiracy according to proof at trial, including but not limited to, lost profits, disgorgement of all profits and revenues received by Defendants, and – to the extent calculable – damages for reputational damage, lost customers, lost relationships, lost revenue, loss of goodwill, corrective advertising, and all other available damages;

b.      Injunctive relief restraining and enjoining Defendants from further violations of the DTSA, Wiretap Act, and CFAA, including the use of confidential information or trade secrets of Plaintiff, and unfairly competing with Plaintiff in any manner;

c.      Injunctive relief restraining and enjoining Defendants from having any contact with Plaintiff's current and/or former key employees;

d.      Ordering that Defendants return all of DermSource's confidential and proprietary information, including a forensic examination of all of Defendants' computing devices, cellular phones, and cloud storage sites;

e.      Prohibiting the Defendants or their agents from selling dermatological pharmaceutical products to Plaintiff's customers, whether directly or indirectly;

f.      Punitive and exemplary damages in an amount to be determined at trial in this case;

g.      Interest (pre-judgment & post-judgment);

h.      Equitable relief in the form of the imposition of an injunction, constructive trust, accounting, and a disgorgement of profits and other benefits received by reason of the unlawful conduct complained of herein;

i.      Enjoining Defendants from operating their business by virtue of their illegal conduct;

j.      Ordering that Defendants pay the costs of suit, including attorneys' fees; and

k.      Such other and further relief as this Court deems just, equitable, and proper.

Dated: Lake Success, New York
        January 16, 2023

Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

_____/s_____

Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1395 (direct dial)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*
*DermSource, Inc.*