UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DERMSOURCE, INC.,

                                        **Case No.: 2:23-cv-281**

                   Plaintiff,

         -against-

CITYMEDRX, LLC, ROBERT ABAEV, and
DAVID ABAEV,

                   Defendants.
-------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**MILMAN LABUDA LAW GROUP PLLC**
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1395 (direct dial)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*
*DermSource, Inc.*

iii

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND .................................................................................................. 1

ARGUMENT ............................................................................................................................ 7

    **A.**    **Plaintiff Is Likely To Suffer Irreparable Injury If Injunctive Relief Is Not Granted.** ......................................................................................................... 9

    **B.**    **DermSource Is Likely to Succeed on the Merits of its Claims.** ................... 14

        1. Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 .......... 14
        2. Wiretap Act ................................................................................................. 17
        3. Computer Fraud & Abuse Act .................................................................... 18
        4. Misappropriation ......................................................................................... 19
        5. Unfair competition ...................................................................................... 21
        6. Tortious interference with business relations & prospective economic advantage ..................................................................................................... 21
        7. Unjust enrichment ...................................................................................... 24
        8. Breach of contract ...................................................................................... 25
        9. Conversion .................................................................................................. 26
        10. Civil Conspiracy ....................................................................................... 26
        11. Breach of Implied Covenant of Good Faith and Fair Dealing.............. 27

    **C.**    **The Balance Of Hardships Tips Considerably In DermSource's Favor.** .. 27

    **D.**    **Granting An Injunction Would Not Harm The Public Interest.** ................ 28

CONCLUSION ....................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>16 Casa Duse, LLC v. Merkin,</u>
    791 F.3d 247 (2d Cir. 2015) ............................................................... 23

<u>511 West 232nd Owners Corp. v. Jennifer Realty Co.,</u>
    98 N.Y.2d 144 (N.Y. 2002) ............................................................... 27

<u>A UA Private Equity Partners, LLC v. Solo,</u>
    No. 17-8035, 2018 WL 2684339 (S.D.N.Y. April 5, 2018) .................... 8,15

<u>Ashland Mgt. v. Janien,</u>
    82 NY2d 395 (1993) ....................................................................... 19

<u>B & M Linen, Corp. v. Kannegiesser, USA, Corp.,</u>
    679 F. Supp. 2d 474 (S.D.N.Y. 2010) ................................................ 23

<u>Benihana, Inc. v. Benihana of Tokyo, LLC,</u>
    784 F.3d 887 (2d Cir. 2015) ............................................................. 29
<u>Broker Genius, Inc. v. Zalta,</u>
    280 F. Supp. 3d 495 (S.D.N.Y. 201 7) ............................................... 14

<u>Capstone Logistics Holdings, Inc. v. Navarrete,</u>
    2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) ........................................ 10,16

<u>Carvel Corp. v. Noonan,</u>
    3 N.Y.3d 182 (2004)) ...................................................................... 23

<u>Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,</u>
    598 F.3d 30 (2d Cir. 2010) ............................................................... 14

<u>Colavito v. New York Organ Donor Network, Inc.,</u>
    8 N.Y.3d 43 (2006) ........................................................................ 26

<u>Dental Supply, Inc. v. Henry Schein, Inc.,</u>
    924 F.3d 57 (2d Cir. 2019) ............................................................... 22

<u>DeWitt Stern Grp., Inc. v. Eisenberg,</u>
    2013 U.S. Dist. LEXIS 78598 (S.D.N.Y. June 4, 2013) .......................... 10

<u>Eagle Comtronics, Inc. v. Pico, Inc.,</u>
    89 A.D.2d 803, 453 N.Y.S.2d 470 (4th Dept. 1982) ............................ 20

<u>Ecolab, Inc. v. Paolo,</u>
    753 F Supp 1100 (E.D.N.Y. 1991) ..................................................... 21

Estee Lauder Cos. v. Batra,
    430 F. Supp. 2d 158 (S.D.N.Y. 2006)..................................................................10,12

ExpertConnect, L.L.C. v. Fowler,
    2019 U.S. Dist. LEXIS 114931, (S.D.N.Y. July 10, 2019) ........................................20

Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.,
    985 F. Supp. 2d 262 (D. Conn. 2013)......................................................................7

Faiveley Transp. Mahmo AB v. Wabtec Corp.,
    559 F .3d 110 (2d Cir. 2009)..................................................................................10

FMC Corp. v. Taiwain Tainan Giant Indus. Co., Ltd.,
    730 F.2d 61 (2d Cir. 1984)....................................................................................10

Free Country Ltd v. Drennen,
    235 F.Supp.3d 559 (S.D.N.Y. 2016)......................................................................14

Garvin GuyButler Corp. v. Cowen & Co.,
    155 Misc. 2d 39 (Sup. Ct. N.Y. Cty. 1992) ...........................................................13

Gluco Perfect, LLC v. Perfect Gluco Products, Inc.,
    No. 14-CIV.-1678 (KAM) (RER), 2014 WL 4966102, (E.D.N.Y. Oct. 3, 2014) ........................13

Greger, Lawlor, Roth, Inc.,
    58 F.3d 27 (2d Cir. 1995)......................................................................................21

Hall v. EarthLink Network, Inc.,
    396 F.3d 500 (2d Cir. 2005)..................................................................................17

Harris v. Seward Park Hous. Corp.,
    79 A.D.3d 425 (1st Dept 2010)..............................................................................25

Henry Schein, Inc. v. Coak,
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) ...............................................................8, 9

Henry Schein, Inc.,
    924 F.3d 57, 69 (2d Cir. 2019)..............................................................................22

IME Watchdog, Inc. v. Gelardi,
    No.: 1:22-cv-1032 (PKC) (JRC), 2022 WL 1525486 (E.D.N.Y. May 13, 2022) ........................16

IQ Dental Supply, Inc. v. Henry Schein, Inc.,
    924 F.3d 57 (2d Cir. 2019)..............................................................................22, 23

Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,
    58 F.3d 27 (2d Cir. 1995)......................................................................................21

Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................................20

JTH Tax, Inc. v. Sawhney,
      2020 U.S. Dist. LEXIS 217977 (S.D.N.Y. 2020) ............................................................. 16

Katz v. Travelers,
      241 F. Supp. 3d 397 (E.D.N.Y. 2017) ............................................................................. 22

Kelly v. Evolution Mkts., Inc.,
      626 F. Supp. 2d 364 (S.D.N.Y. 2009) ............................................................................. 20

Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.,
      1:18-CV-08333-ALC, 2019 WL 10960397 (S.D.N.Y. June 20, 2019) ........................... 13

Kirch v. Liberty Media Corp.,
      449 F.3d 388 (2d Cir.2006) ............................................................................................. 22

Lama Holding Co. v. Smith Barney Inc.,
      88 N.Y.2d 413 (1996) ...................................................................................................... 22

Levin v. Kitsis,
      82 A.D.3d 1051 (2d Dept 2011) ..................................................................................... 26

Long Is. Conservatory, Ltd. v. Jaisook Jin,
      836 N.Y.S.2d 486 (N.Y. Sup. Ct. 2007) .......................................................................... 20

Matter of Verizon NY Inc. v. NY State Pub. Serv. Commn.,
      46 Misc. 3d 858 (Sup. Ct., Albany County 2014). ......................................................... 19

Mazzaro de Abreu v. Bank of Am. Corp.,
      525 F. Supp. 2d 381 (S.D.N.Y. 2007) ............................................................................. 24

Medidata Solutions, Inc. v. Veeva Sys.,
      2018 U.S. Dist. LEXIS 199763 (S.D.N.Y. Nov. 26, 2018) ............................................. 15

Mickey's Linen v. Fischer,
      No. 17 C 2154, 2017 WL 3970593 (N.D. Ill. September 8, 2017) .................................. 9

Mission Capital Advisors LLC v. Romaka,
      No. 15-Civ.-5878 WL 11517040 (S.D.N.Y. July 22, 2016) ............................................ 8

Mister Softee, Inc. v. Diaz,
      2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020) ........................................... 9, 11

N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,
      883 F.3d 32 (2d Cir. 2018) .............................................................................................. 8

Nassau Control Corp. v. Innovative Control Mgmt. Corp.,
      1996 WL 496610 (E.D.N.Y. June 20, 1996) ................................................................... 10

NextG Networks of New York, Inc. v. City of New York,
      2004 WL 2884308 (S.D.N.Y. Dec. 10, 2004) ................................................................. 11

Nickelodeon Consumer Privacy Litig.,
    827 F.3d 262 (3d Cir. 2016)...........................................................................17

North Atlantic Instruments, Inc. v. Haber,
    188 F.3d 38 (2d Cir. 1999)..............................................................................10

Panorama Consulting Sols., LLC v. Armitage,
    2017 WL 11547493 (D. Colo. June 9, 2017).................................................11

Plaza Motors of Brooklyn, Inc. v. Bogdasarov,
    No.: 1:21-cv-6545 (KAM), 2021 WL 5630910 (E.D.N.Y. Dec. 1, 2021)....................................16

Popat v. Levy,
    328 F. Supp. 3d 106 (W.D.N.Y. 2018) ........................................................22

RKL Inc., d/b/o Roll-Krafi v. Grimes,
    177 F. Supp. 2d 859 (N.D. III. 2001)............................................................15

S. Nassau Control Corp. v. Innovative Control Mgmt. Corp.,
    1996 U.S. Dist. LEXIS 22603 WL 496610 (E.D.N.Y. June 20, 1996) ........................................10

Salinger v. Colting,
    607 F.3d 68 (2d Cir. 2010).........................................................................10, 11

Scherer Design Group, LLC v. Schwartz,
    2018 U.S. Dist. LEXIS 125644 (D.N.J. July 26, 2018).................................13

SEC v. Citigroup Global Markets, Inc.,
    673 F.3d 158 (2d Cir. 2012)...........................................................................28

Sharma v. Skaarup Ship Mgmt. Corp.,
    916 F.2d 820 (2d Cir.1990)............................................................................22

Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC,
    468 F. App'x. 43 (2d Cir. 2012) ..................................................................9, 11

Spa World Corp. v. Lipschik,
    No. 09-CV-1711 (TCP), 2010 WL 11632681 (E.D.N.Y. Sept. 9, 2010)....................................18

State of New York v. Seventh Regiment Fund,
    98 N.Y.2d 249 (2002) ....................................................................................26

Testing Servs., N.A. v. Pennisi,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) ..........................................................20

Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,
    487 F.3d 89 (2d Cir. 2007).............................................................................27

UA Private Equity Partners. LLC v. Solo,
    No. 17-CIV.-803 (S.D.N.Y. November 6, 2017).........................................8, 15

United States v. Gasperini,
    894 F3d 482 (2d Cir. 2018) .......................................................................................... 19

Upwork Glob. Inc. v. Fan Lian,
    No. 19-CIV.-7719 (NC), 2021 WL 1080526 (N.D. Cal. Mar. 2, 2021) ....................... 18

Winter v. Nat. Hus. Def Council, Inc.,
    555 U.S. 7 (2008) ....................................................................................................... 8

World Wide Commc'ns, Inc. v. Rozar,
    No. 96-CIV.-1056 (MBM), 1997 WL 795750 (S.D.N.Y. December 30, 1997) ........... 22

**<u>Statutes</u>**

18 U.S.C. § 757, cmt. b (1939) ............................................................................................ 12

18 U.S.C. § 1030 ........................................................................................................... 18, 19

18 U.S.C. § 1831 .............................................................................................................. 14

18 U.S.C. § 1836 ............................................................................................................... 8

18 U.S.C. § 1839 ..................................................................................................... 12, 14, 15

18 U.S.C. § 2510 .............................................................................................................. 17

18 U.S.C. § 2511 .............................................................................................................. 17

18 U.S.C § 2520 ........................................................................................................... 9, 17

Fed. R. Civ. P. 65 ............................................................................................................. 1

## PRELIMINARY STATEMENT

This case involves the theft of Plaintiff's confidential information and trade secrets and through illegal wiretaps, by Defendants, former business partners of Plaintiff.  Defendants' scheme was achieved by them poaching a high-level key employee to cut Plaintiff out of its business have him steal for them confidential information and trade secrets, customers, and employees, abruptly and in violation of an agreement forbidding same and in violation of the law through the use of inappropriate means, such as wiretaps to listen in on conversations between the principals of Plaintiff.  The abominable conduct of the Defendants must be put to a stop.

This Memorandum of Law is respectfully submitted by DermSource, Inc. (hereinafter the "Plaintiff" or "DermSource") in support of its urgent need for an *ex parte* temporary restraining Order ("TRO") and preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the Defend Trade Secrets Act ("DTSA"), Wiretap Act, and Computer Fraud & Abuse Act ("CFAA"), to issue against Defendants to immediately stop their hijacking and theft of DermSource's confidential information and trade secrets, customer information, and employees, all of which they literally stole from Plaintiff in violation of their contractual and common law duties to Plaintiff.   It took DermSource's founder years to create, develop, and establish its unique business model which Defendants benefitted from and have now stolen through bribery and deception while working with Plaintiff under an agreement that forbids them from making any material changes to its operations.  Without this Court's immediate intervention, the irreparable harm to DermSource will continue unabated and without remedy.

## FACTUAL BACKGROUND

Reference is respectfully made to the sworn declaration of Mr. Davydov, which is detailed and accompanied by Exhibits A through P, as well as the complaint in support of this application.

1

Each of the foregoing are incorporated by reference herein.

DermSource is a Group Purchasing Organization ("GPO") representing over eight hundred (800) independent retail pharmacies. CityMedRx, LLC ("CityMed") is a pharmaceutical wholesaler which had a vendor relationship with DermSource since DermSource's inception in 2018. Robert Abaev ("Robert") and David Abaev ("David") are the principals and/or members of CityMed, and they have personally engaged in the illegal conduct complained of herein.

On January 7, 2021, CityMed and DermSource entered into a Joint Marketing and Sale of Business agreement. Under this agreement, DermSource used its purchasing platform, DermSource.com, to submit purchase orders *exclusively* to CityMed to be filled on behalf of its member pharmacies, whereas prior thereto, CityMed was *one of several* vendors of DermSource. Under this same agreement, Defendants were not permitted to make any material change in their operations without Plaintiff's consent.

For over a decade, DermSource's founder built relationships in the dermatological pharmaceutical channels of distribution and, in 2018, decided to launch DermSource, whose business model serves as a group purchasing organization dedicated to discounted dermatology products available to independent retail pharmacies in the United States, and with a mission to help the independent pharmacies stay in business.

Since launching and exhibiting DermSource at the National Community Pharmacists Association's annual event held in Boston in 2018, the DermSource brand represents and publicizes "truth in pricing" and "purchase power" for the independent retail pharmacy – a brand that captured the attention of and engaged hundreds of independent retail pharmacies.

DermSource employed a single key employee, Bahrum Siddiqui (hereinafter "Siddiqui"), at inception.

2

DermSource's founder and CEO educated, mentored, and inspired in the field of pharmaceuticals, and Siddiqui became instrumental in DermSource's growth to its customer base which, as of today, has approximately eight hundred (800) members.

Prior to being employed by DermSource, Siddiqui had no relevant background or experience in the dermatology or pharmaceutical industry. DermSource trained Siddiqui in every single aspect of its business, including sales strategy for onboarding customers, business acumen, customer service skills, and administrative skills at DermSource.

In fact, DermSource expended substantial resources in, for example, routinely flying Siddiqui out of the state to personally engage with local pharmacy owners and/or operators, attend and exhibit in relevant trade shows, and to build brand awareness in various States.

Since its inception, DermSource has utilized CityMed, among others, as a wholesaler to fulfill orders. In or about January 2021, however, DermSource and CityMed entered into an exclusive agreement to have CityMed fulfill all orders sourced by DermSource. This agreement was premised on business concept of consolidating DermSource's and CityMed's collective services in order to present a first-to-market duo that, together, as a pharmaceutical wholesaler and dermatology-specialized-GPO, would be marketed and sold as a single enterprise.

In fact, the parties were successful in marketing themselves to a conglomerate in the pharmaceutical industry and achieved a valuation of 0.75X revenue, which accumulated to approximately $24 million for their combined businesses. Regrettably, the parties were unable to consummate the transaction with the conglomerate for reasons outside of their control.

However, the foregoing anticipated sale was achieved in large part due to the parties' agreement to work exclusively with each other, and to require the consent of each other prior to making any material change in the operations of the parties' respective businesses.

The parties thus intended to renew their agreement which, by its terms, expired on December 31, 2022, in order to attempt to find another buyer and complete a similar – or even better – transaction.

The parties therefore met on December 5, 2022 at DermSource headquarters in New Hyde Park, New York, to negotiate the terms of their agreement, and did so with the understanding that – pending any such new agreement – the parties would continue to work together, in good faith, as they did throughout their relationship.   However, CityMed began to engage in bad-faith bargaining during the parties' negotiations and prior to the expiration of the Joint Marketing and Sale of Business agreement.

For example, during the negotiations, DermSource offered to increase shared revenue by introducing an additional wholesaler to service DermSource members in the approximately sixteen (16) states that CityMed is not licensed in (and was thus unable to serve or distribute product that they are unable to source). As a business partner, DermSource offered to CityMed in good faith fifty percent (50%) of any revenue generated from any sales to any such additional wholesaler.

CityMed not only rejected this proposal; it countered that they seek a $1-million liquidated damages provision for any violation of the exclusivity provision of their agreement.

In addition, and as another example, while in January 2021, pursuant to CityMed's agreement with DermSource, CityMed agreed to pay DermSource a three percent (3%) fee from CityMed's overall revenue in exchange for DermSource's commitment to appoint CityMed as their exclusive wholesaler (and also provide CityMed with all DermSource members generated invoices and sales), CityMed sought to wriggle out of this financial arrangement despite the fact that DermSource was singlehandedly responsible for CityMed's explosive growth in revenue.

4

Indeed, during their negotiations, after working with DermSource customers for two (2) years and benefitting from DermSource's exclusive relationship, CityMed proposed reducing DermSource's percentage of revenue to one based solely on sales sourced by DermSource's online platform.

CityMed further sought to remove any obligation to pay DermSource any fee if a DermSource member called CityMed directly to place an order, as opposed to placing one on DermSource's platform.

DermSource was baffled by these requested changes to the parties' agreement, which sought to reap the benefit of an exclusive arrangement in perpetuity while paying for same for only two (2) years, with no upside to DermSource.

Then, in the midst of the parties' negotiations, Siddiqui suddenly gave two (2) weeks' notice that he was leaving the employ of DermSource, and stated in his December 20, 2022 resignation notice that DermSource had his cooperation for any assistance needed with the transfer of his responsibilities during any transition period.

However, while Siddiqui agreed to return all company property and information, he failed to provide significant information about the customers sourced by and through his employment with DermSource; specifically, Siddiqui failed to provide each pharmacy's individual point of contact and preferred method of communication.  Moreover, and crucially, Siddiqui refused, despite due demand, to contact DermSource's customers and inform them of the transition to ensure continuity with DermSource.

Indeed, in a foreboding email just a week after his resignation, on December 27, 2022, Siddiqui unexpectedly stated that he felt "uncomfortable" providing DermSource with its customer information and abruptly left his employ prior to the two (2) week period.

Shortly thereafter, but prior to the official termination date of their agreement, CityMed – without warning – ceased fulfilling orders from DermSource, effectively cutting DermSource out of its business completely while servicing the customers DermSource sourced!

Defendants poached Siddiqui and engaged in illegal wiretapping and bribery to cut DermSource out of its business and deprive it of the contractually agreed-upon benefit it expected to receive, all in an effort to line Defendants' pockets and destroy the DermSource business and its brand. Ironically, the parties' agreement covered confidentiality of trade secrets. Notwithstanding, Defendants stole the confidential protected information ("CPI") of DermSource, including its business model, contact information of DermSource's customers, the details of all of its customers' prior transactions with DermSource, and the details concerning each customer's preferences.

Despite Defendants' contractual and common law duties owed to DermSource as a business partner, they unlawfully used the CPI by poaching DermSource's key employee, Siddiqui, copying DermSource's business model, and serving DermSource's customers while cutting DermSource completely out of its business with nothing offered for the continued business customers sourced by DermSource will bring to CityMed.

Defendants have taken the additional step of obtaining the CPI Plaintiff's founders painstakingly worked to create to make themselves a roadmap for how to mimic DermSource's business model without doing any of the hard work. Defendants' misappropriation of DermSource's CPI to steal the benefit of the bargain DermSource obtained during their contractual relationship with Defendants, and continuing to date, is unlawful and has devastated Plaintiff's business for which injunctive relief is needed to save DermSource from complete destruction.

It gets worse.

To add insult to injury, Defendants illegally wiretapped Plaintiff's camera system to listen in on internal conversations Plaintiff had before, during, and after their December 2022 negotiations in a nefarious scheme to further damage and destroy DermSource.

As set forth below, and in the accompanying declarations from DermSource's founder, Yuriy Davydov ("Mr. Davydov") and Emanuel Kataev, Esq., Plaintiff's undersigned counsel, it is incontrovertible that Defendants illegally and unlawfully misappropriated DermSource's CPI, its customer information, and key employee, for their personal benefit and to significantly damage DermSource.

Defendants' perfidious conduct that is causing deep irreparable harm can only be arrested by this Court granting the instant request for a TRO and preliminary injunction to issue.

In fact, DermSource provides evidence in the Declaration of Mr. Davydov of at least one customer who thought he was making a purchase through DermSource's platform when, it turned out, that Siddiqui processed the order directly with CityMed in order to cut DermSource out.

A denial of this application will only greenlight Defendants' treachery to continue with impunity and allow DermSource to flounder and fail.

As demonstrated below, DermSource has no adequate remedy at law and is entitled to a TRO and a preliminary injunction prohibiting Defendants from maintaining and utilizing DermSource's CPI.

## **ARGUMENT**

In the Second Circuit, the standard for issuance of a TRO is the same as the standard for a preliminary injunction.  See Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng., 985 F. Supp. 2d 262, 270 (D. Conn. 2013), aff'd, 557 Fed. Appx. 53 (2d Cir. 2014).

"A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018). Additionally, injunctions are typically warranted only where the balance of equities tips in the moving party's favor and where an injunction is in the public interest. See Winter v. Nat. Hus. Def Council, Inc., 555 U.S. 7, 20 (2008).

For the reasons set forth below, DermSource has satisfied these requirements, in addition to those required for relief under the DTSA, the Wiretap Act, and the CFAA, and the Court should grant a TRO and Preliminary Injunction to prevent Defendants from continuing to possess and cause further damage to DermSource as a result of their unauthorized possession of DermSource's CPI, and its theft of DermSource's customers and employees. Injunctive relief is separately warranted under the Defend Trade Secrets Act ("DTSA") to:

> [P]revent any actual or threatened misappropriation ... on such terms as the court deems reasonable, provided the order does not ( 1) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence or threatened misappropriation and not merely on the information the person knows; or (2) otherwise conflict with … state law prohibiting restraints on the practice of a lawful profession, trade or business; [and] if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret.

See 18 U.S.C. § 1836(3)(A)(I); see also, e.g., A UA Private Equity Partners. LLC v. Soto, No. 17-CIV.-8035, (S.D.N.Y. Nov. 6, 2017) (granting plaintiffs *ex parte* motion for TRO finding that plaintiff will likely succeed on its DTSA claim); Mission Capital Advisors LLC v. Romaka, No. 16-Civ.-5878, 2016 WL 11517040 (S.D.N.Y. Jul. 22, 2016) (same); Henry Schein, Inc. v. Coak, 191 F. Supp. 3d 1072 (N.D. Cal. 2016) (granting a TRO and preliminary injunction preventing a

8

consultant from accessing, using, or sharing confidential data stolen from former employer in violation of the DTSA); Mickey's Linen v. Fischer, No. 17-cv-2154, 2017 WL 3970593 (N.D. Ill. September 8, 2017) (granting injunctive relief finding that defendant would inevitably use or disclose the plaintiff company's trade secrets if not enjoined, demonstrating likelihood of success).

Injunctive relief is also warranted under the Wiretap Act to the prevent use and require the surrender of Defendants' electronic devices that have been used to access the information, data, and communications that have been intercepted, recorded, or otherwise captured by Plaintiff's camera system on Defendants' (or their agents) devices and for such other equitable relief as may be appropriate. See 18 U.S.C § 2520(b). DermSource seeks to secure the immediate and complete return of its proprietary and confidential trade secret information misappropriated by, and in the possession and control of, Defendants and to prevent Defendants' dissemination or use of such information to unfairly compete against and continue to harm DermSource. DermSource also seeks the return of its information, which Defendants illegally obtained, as well as an Order prohibiting them from communicating with DermSource's current and/or former employees and customers, which it spent significant time, effort, and resources cultivating and sourcing.

**A. Plaintiff Is Likely To Suffer Irreparable Injury If Injunctive Relief Is Not Granted.**

To establish irreparable injury, one must demonstrate that absent preliminary relief, it will suffer "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." See Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC, 468 Fed. Appx. 43, 45 (2d Cir. 2012). Moreover, a loss that is difficult to replace or to measure is generally irreparable. See Mister Softee, Inc. v. Diaz, 2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020) (irreparable injury established where allegations that, as a result of defendant's infringement, business will be diverted, and goodwill likely to be lost) (citing Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010)).

9

"[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm." See Capstone Logistics Holdings, Inc. v. Navarrete, 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018), aff'd in part and remanded in part, 796 Fed. Appx. 55 (2d Cir. Mar. 5, 2020); see also S. Nassau Control Corp. v. Innovative Control Mgmt. Corp., 1996 WL 496610, at * 4 (E.D.N.Y. June 20, 1996) ("The actual or likely use of . . . a former employer's confidential customer information,  and the resulting possible loss of customers, constitutes irreparable harm."); DeWitt Stern Grp., Inc. v. Eisenberg, 2013 U.S. Dist. LEXIS 78598 (S.D.N.Y. June 4, 2013) ("Irreparable harm to an employer results through both the loss of client relationships and customer goodwill from a breach of a non-compete clause, and where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences").

Indeed, appropriately tailored injunctions can be useful to protect plaintiffs from the effects of misappropriated trade secrets by defendants. See, e.g., Faiveley Transp. Mahmo AB v. Wabtec Corp., 559 F .3d 110, 119 (2d Cir. 2009).   In general, the imminent use of a trade-secret constitutes irreparable harm. Id. at 118-19 ("A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets"); see also North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38. 49 (2d Cir. 1999); FMC Corp. v. Taiwain Tainan Giant Indus. Co., Ltd., 730 F.2d 61, 63 (2d Cir. 1984) ("[a] trade secret once lost is, of course, lost forever" and as a result, such a loss "cannot be measured in monetary damages."); Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) ("Even where a trade secret has not yet been disclosed, irreparable harm may be found … upon a finding that trade secrets will inevitably be disclosed ... ).

In considering irreparable harm, the court should consider whether "providing plaintiff with monetary relief will simply not remedy the loss of competitive advantage plaintiff may lose from the alleged misappropriation of its confidential information." See Panorama Consulting Sols., LLC v. Armitage, 2017 WL 11547493, at *1 (D. Colo. June 9, 2017); see also NextG Networks of New York, Inc. v. City of New York, 2004 WL 2884308 (S.D.N.Y. Dec. 10, 2004); Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC, 468 Fed. Appx. 43, 45 (2d Cir. 2012).

Here, Defendants have unquestionably stolen DermSource's CPI containing its business plan, customer information and the details concerning DermSource's customers' contacts, pricing, and preferences which Defendants have been and continue to utilize to serve DermSource's customers by utilizing the key employee of DermSource that Defendants have poached.  This continued course of conduct has caused and will cause DermSource irreparable injury as DermSource stands to lose its entire business and customer base that it has spent years building through cultivation of relationships with time, effort, and substantial resources.  In fact, DermSource already lost substantial revenue due to Defendants' theft of its CPI, as DermSource has been unable to fulfill a significant amount of orders for its customers through its platform since December 30, 2022!  See Mister Softee, Inc. v. Diaz, 2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020) (irreparable injury established where the plaintiffs alleged that, as a result of defendant's infringement, business will be diverted) (citing Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010)).  Injunctive relief is necessary to obtain the return of and prevent the continued unlawful use of DermSource's CPI.  Trade secrets can be any "compilation of information which is used in one's business, and which gives [the owner] the opportunity to obtain an advantage over competitors who do not know or use it." See Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 175 (S.D.N.Y. 2006) (summarizing New York law).

11

The DTSA provides even broader protection:

> ... all forms and types of financial, business, …, technical, [or] economic … information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing ...

See 18 USC § 1839.

Such information is considered a "trade secret" if: "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information. See 18 USC§ 1839(3).[1]

DermSource's CPI includes, among other things, customer lists, details about customers (such as the identity of the contact person at each customer and preferred method of communication), methods and procedures of business operations, financial data, agreements (including fees and scope of services), purchase history, customer preferences, and similar data. This is the very information upon which DermSource's entire business is based and certainly constitutes trade secrets under either definition, but unquestionably under the DTSA.

Indeed, this information is the product of a vast amount of time, effort, and resources by DermSource's founder (who has been in this unique business since 2018).

---

[1] A number of other factors also bear on whether information is truly a trade secret, including "(1) the extent to which the information is known outside of the business: (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; ( 4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information: and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." See Estee Lauder Cos. v. Batra at 175.

It would be and has proven to be highly useful to a competitor such as the Defendants (whose founders have relied on Plaintiff to source it customers and now seek to rid themselves of Plaintiff upon poaching its key employee) who have utilized this ill-gotten data and information to cut DermSource out of the business Defendants worked in together to build, which Defendants would not be able to but for their illegal conduct.

Defendants' conduct is truly shocking to the conscience.  The trade secret information has been and is currently being used by Defendants to lure clients away from DermSource's platform to retain the full profit on the revenue generated without paying DermSource, and to provide Defendants with inside information as to the nature and extent of DermSource's operations. Defendants' unlawful conduct also allows them to use DermSource's proprietary information for their sole benefit, which they achieved through improper means such as illegal wiretaps and poaching Plaintiff's key employee to obtain information which belongs to DermSource.

"[T]he diversion of a company's customers may also constitute irreparable harm." See Scherer Design Group, LLC v. Schwartz, 2018 U.S. Dist. LEXIS 125644 * 23 (D.N.J. July 26, 2018); see also Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd., 1:18-CV-08333-ALC, 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) (diversion of customers is irreparable and incalculable, thereby warranting injunctive relief); Gluco Perfect, LLC v. Perfect Gluco Products, Inc., No. 14-CIV.-1678 (KAM) (RER), 2014 WL 4966102, at *16 (E.D.N.Y. Oct. 3, 2014) (same, entering preliminary injunction); Garvin GuyButler Corp. v. Cowen & Co., 155 Misc. 2d 39, 45 (Sup. Ct. N.Y. Cty. 1992) ("The prohibition of defendants to utilize … information … will not prejudice defendants but … shall maintain the *status quo*"). Here, where Plaintiff has shown that Defendants have diverted Plaintiff's key employee and its customer information, the element of irreparable harm has undoubtedly been met.

**B.** **DermSource Is Likely to Succeed on the Merits of its Claims.**

The Second Circuit has adopted a flexible standard with regard to the "likelihood of success" requirement, allowing a party seeking a preliminary injunction to show either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010). To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainly. [It] need only make a showing that the probability of his prevailing is better than fifty percent." See Broker Genius, Inc. v. Zalta, 280 F. Supp. 3d 495, 509 (S.D.N.Y. 2017) (citation omitted). As discussed below, DermSource will likely succeed on the merits of its claims for violation of the DTSA, Wiretap Act, CFAA, misappropriation, unfair competition, tortious interference with business relations & prospective economic advantage, unjust enrichment, breach of contract, conversion, civil conspiracy, and breach of implied covenant of good faith and fair dealing.

**1. Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836**

The DTSA amends the existing federal Economic Espionage Act (the "EEA") (18 U.S.C. § 1831, *et. seq.*) and creates a federal cause of action for the misappropriation of trade secrets used in interstate commerce. The DTSA requires plaintiff to establish "an unconsented disclosure or use of a trade secret by one who: (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." See Free Country Ltd v. Drennen, 235 F.Supp.3d 559, 5 (S.D.N.Y. 2016); see also 18 U.S.C. § 1839(5).

The DTSA's definition of "improper means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but expressly excludes "reverse engineering" and "independent derivation." See 18 U.S. § 1839(6)(A)-(B).

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret."  See Medidata Solutions, Inc. v. Veeva Sys., 2018 U.S. Dist. LEXIS 199763, *8 (S.D.N.Y. Nov. 26, 2018).  Under the DTSA, the term "trade secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" if (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." See 18 U.S.C. § 1839(3).

A defendant misappropriates a trade secret under the DTSA (1) when it acquires a trade secret by improper means, or (2) discloses or uses the trade secret without consent.  See Medidata Solutions, Inc., 2018 U.S. Dist. LEXIS 199763 at 11.

As set forth above, the material misappropriated by Defendants by their calculated, conniving, and systematic actions fall squarely within the scope of the DTSA. See A UA Private Equity Partners, LLC v. Solo, No. 17-8035, 2018 WL 2684339, *7 (S.D.N.Y. April 5, 2018) (holding that complaint plausibly alleges violation of the DTSA as defendant was alleged to have uploaded plaintiffs trade secrets from her work laptop to her personal cloud-based storage without plaintiffs permission); RKL Inc., d/b/o Roll-Krafi v. Grimes, 177 F. Supp. 2d 859, 875-77 (N.D. Ill. 2001) (finding sufficient evidence of acquisition of theft when employee downloaded or copied trade secrets from work computer to home computer).

First, Defendants violated their agreement when they made a material change in operations by poaching DermSource's key employee, and then misappropriated Plaintiff's CPI by and through this key employee as well as through illegal wiretaps.

Second, the information Defendants misappropriated from DermSource is not readily ascertainable.  No one can reverse engineer, or learn by research alone, how DermSource sourced its customers, made its business model, the scope of services they provide, or its financial status. Armed with this information, Defendants have decided to compete with DermSource, and could *and did* create a complete and comprehensive threat to DermSource's business far faster than one that has not engaged in unlawful competition arising out of the theft of DermSource's trade secrets.

Third, DermSource vigilantly safeguarded its data by only allowing its key employee – who has worked for DermSource since its inception and was instrumental to its growth – access to that data by providing him a secure customer-relationship-management ("CRM") program through which he was to enter all customer data after being extensively trained about how to source customers.

Defendants should not be permitted to exploit and take unfair advantage of DermSource's relationships and goodwill, particularly where those relationships and goodwill were cultivated at DermSource's considerable expense and where Defendants have stolen DermSource's CPI through misappropriation.  See Capstone Logistics Holdings, Inc. v. Navarrete, 2020 U.S. Dist. LEXIS 110304 (S.D.N.Y. June 23, 2020) (granting injunctive relief on DTSA claims); JTH Tax, Inc. v. Sawhney, 2020 U.S. Dist. LEXIS 217977 (S.D.N.Y. 2020) (same).

Courts routinely grant the relief sought herein in such circumstances.  See IME Watchdog, Inc. v. Gelardi, No.: 1:22-cv-1032 (PKC) (JRC), 2022 WL 1525486, at *1 (E.D.N.Y. May 13, 2022); see also Plaza Motors of Brooklyn, Inc. v. Bogdasarov, No.: 1:21-cv-6545 (KAM), 2021 WL 5630910, at *1 (E.D.N.Y. Dec. 1, 2021).

Therefore, DermSource is likely to succeed on the merits of its DTSA claims.

### 2. Wiretap Act

The Wiretap Act makes it unlawful to "intentionally intercept, endeavor to intercept, or procure any other person to intercept" a wire, oral, or electronic communication, or to use the contents of any such communication "knowing or having reason to know that the information was obtained in violation of [the Act]." See 18 U.S.C. § 2511(1)(a), (c). Section 2520, which provides for civil remedies for a violation of the Wiretap Act, states that "any person whose wire, oral, or electronic communication is intercepted ... in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." See 18 U.S.C. § 2520; see also In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 274 (3d Cir. 2016) (stating that a prima facie case under the Wiretap Act requires showing that the defendant "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device"); Hall v. EarthLink Network, Inc., 396 F.3d 500, 503 (2d Cir. 2005) (finding that the [Wiretap Act] provides a private right of action against "anyone who 'intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any ... electronic communication' " (quoting § 2511(1)(a))) (emphasis added).  "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Id. § 2510(4).

Here, Plaintiff is likely to succeed because it provides evidence that Defendants received and acted upon intercepted oral communications that they procured Plaintiff's key employee to intercept, and then used the information they learned from these wiretaps against Plaintiff.   The foregoing is sufficient to state a claim for relief under the Wiretap Act, and the evidence presented conclusively establishes a violation thereof.  See Spa World Corp. v. Lipschik, No. 09-CV-1711 (TCP), 2010 WL 11632681, at *14 (E.D.N.Y. Sept. 9, 2010).

Accordingly, Plaintiff has established a likelihood of success with respect to its claim under the Wiretap Act.

### 3. Computer Fraud & Abuse Act

Section 1030(a)(4) of the CFAA punishes those who (1) knowingly and with intent to defraud (2) accesses a protected computer (3) without authorization or exceed authorized access and (4) obtain something of value over $5,000.  See 18 U.S.C. § 1030(a)(4).  The statute defines "computer" as "an electronic . . . or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

"Protected computer" is defined, as relevant here, as one that "is used in or affecting interstate or foreign commerce or communication . . . ." See 18 U.S.C. § 1030(e)(2)(B).  Where a defendant obtains a password without authorization, he violates the CFAA.  See Upwork Glob. Inc. v. Fan Lian, No. 19-CIV.-7719 (NC), 2021 WL 1080526, at *3 (N.D. Cal. Mar. 2, 2021), report and recommendation adopted sub nom. Upwork Glob. Inc. v. Lian, 19-CIV.-7719 (SI), 2021 WL 1056815 (N.D. Cal. Mar. 19, 2021) ("Upwork's claim for relief under the CFAA is sufficiently pled. … Lian exceeded authorization by obtaining passwords to freelancer accounts and posing as the freelancers on the Upwork platform. … Finally, through unauthorized access, Lian obtained valuable information … that Lian could not have accessed otherwise …").

Here, Plaintiff has established by and through the evidence it submits that Defendants knowingly accessed Plaintiff's camera system, a computer, without authorization.  Plaintiff has also established that the value of the information Defendants learned and the trade secrets Defendants misappropriated by and through the use of the camera system exceeds well over $5,000.00 because Defendants' conduct has caused Plaintiff irreparable harm.

The Second Circuit has found that conduct such as Defendants' violates the CFAA.  See United States v. Gasperini, 894 F3d 482, 487 (2d Cir. 2018) ("In this case, Gasperini was found by the jury to have hacked into … computers without permission, thereby gaining access to all of the information stored on those computers. … There is thus no doubt that all of these actions fall within the core meaning of the phrase "accesses a computer without authorization ... and thereby obtains ... information from [a] protected computer" as the … terms are used in § 1030(a)(2)(C)").

Accordingly, Plaintiff is likely to succeed on its CFAA claim.

**4. Misappropriation**

As with the DTSA, Defendants have also misappropriated trade secrets and confidential information under New York law.  A "trade secret" under New York law has been defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors which do not know or use it." See Ashland Mgt. v. Janien, 82 NY2d 395 (1993); accord Matter of Verizon NY Inc. v. NY State Pub. Serv. Commn., 46 Misc. 3d 858 (Sup. Ct., Albany County 2014).

In determining whether a trade secret exists, New York courts consider the following factors: (a) the extent to which the information is known outside of the owner's business; (b) the extent to which it is known by employees and others involved in the owner's business; (c) the extent of measures taken by the owner to guard its secrecy; (d) the value of the information to him and to his competitors; (e) the amount of effort or money expended by the owner to develop the information; and (f) the ease or difficulty with which the information could be properly acquired or duplicated by others.  See Eagle Comtronics, Inc. v. Pico, Inc., 89 A.D.2d 803 (4th Dept. 1982); Long Is. Conservatory, Ltd. v. Jaisook Jin, 836 N.Y.S.2d 486, 486 (N.Y. Sup. Ct. 2007).

As discussed *supra* under the DTSA analysis, the information to which Defendants obtained access falls squarely within these parameters. See ExpertConnect, L.L.C. v. Fowler, 2019 U.S. Dist. LEXIS 114931, *18 (S.D.N.Y. July 10, 2019) ("The requirements are similar for showing a misappropriation of a trade secret under the DTSA and misappropriation under New York common law… For substantially the same reasons that the Complaint sufficiently pleads a DTSA claim, the Complaint also states a claim for misappropriation of trade secrets ….").

Further, New York courts also have held that an employer may have a protectable interest in confidential information even if it does not rise to the level of a trade secret. See Kelly v. Evolution Mkts., Inc., 626 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (granting injunctive relief and finding that an employer had a protectable interest in its confidential information); Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc., 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) ("even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee … is to be enjoined as unfair competition").

DermSource's CPI is afforded protection under New York law, and for the same reasons that DermSource will prevail on its claim under DTSA, it will also prevail on its claim for misappropriation of trade secrets and confidential information under New York law. See Testing Servs., N.A. v. Pennisi, 443 F. Supp. 3d 303, 342 (E.D.N.Y. 2020) ("…plaintiff has adequately demonstrated a likelihood of success on the merits of its federal and state law claims for misappropriation of trade secrets against the individual defendants and, therefore, the branch of its motion seeking a preliminary injunction enforcing the confidentiality provisions in the individual defendants' agreements with plaintiff and enjoining them from further misappropriation or dissemination of plaintiff's trade secrets and confidential information is granted.")

### 5. Unfair competition

To establish a New York state law unfair competition claim, a plaintiff must allege (1) "misappropriation of the labors and expenditures of another," that is (2) "likely to cause confusion or to deceive purchasers as to the origin of the goods," and (3) "bad faith." See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34-35 (2d Cir. 1995).

Here, DermSource easily establishes a likelihood of success on the merits because, as set forth in the Declaration of Mr. Davydov, customers have sought to purchase product by and through DermSource's platform and subsequently cancelled the orders, claiming that Plaintiff's key employee already contacted them.

Plaintiff developed relationships with these customers and went through the rigorous task of starting the business, preparing pricing models, negotiating better prices, and building its client list one by one to grow DermSource.

This work, including the pricing models and key services Plaintiff provides were misappropriated by the Defendants to unfairly compete against Plaintiff. Further, Defendants have directly diverted Plaintiff's key employee and corporate opportunities to themselves using this confidential and proprietary information.

Finally, Defendants' bad faith is self-evident because they engaged in illegal and improper means to obtain the confidential information and trade secrets of Plaintiff. Accordingly, DermSource is likely to prevail on its unfair competition claim. See Ecolab, Inc. v. Paolo, 753 F Supp 1100, 1111 (E.D.N.Y. 1991) (granting former employer injunctive relief on its unfair competition claim).

### 6. Tortious interference with business relations & prospective economic advantage

Plaintiff will also prevail on its tortious interference claims.

To state a claim for tortious interference with contract under New York law, one must allege: (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) damages. See Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir.2006) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413 (1996)).   In addition, the plaintiff must assert, with respect to each defendant, that the defendant'' actions were the "but for" cause of the alleged breach—in other words, that there would not have been a breach but for the activities of the defendant. See Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir.1990).

"[T]he law requires some factual specificity in pleading tortious interference." See World Wide Commc'ns, Inc. v. Rozar, No. 96-CIV.-1056 (MBM), 1997 WL 795750, at *7 (S.D.N.Y. December 30, 1997) (citation omitted).

Separately, "[u]nder New York law, a plaintiff claiming tortious interference with prospective business relations[2] must show (1) 'the defendant's interference with business relations existing between the plaintiff and a third party,' (2) 'either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or in any other way improper.'" See IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 69 (2d Cir. 2019) (quotation omitted).   "To satisfy the first prong, 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.'" Id. (quoting B & M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010).

---

[2] "'[T]ortious interference with business relations and tortious interference with prospective economic advantage are not distinct causes of action.'" See Popat v. Levy, 328 F. Supp. 3d 106, 131 n.5 (W.D.N.Y. 2018) (quotation and other citation omitted).   "[N]o matter the term used, the elements are the same." See Katz v. Travelers, 241 F. Supp. 3d 397, 404 (E.D.N.Y. 2017), reconsideration denied, No. 16-CIV.-4389 (ADS) (SIL), 2017 WL 4180012, 2017 U.S. Dist. LEXIS 153275 (E.D.N.Y. Sept. 20, 2017).

"[W]here 'the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct.'" Id. (quoting [IQ Dental Supply, Inc., 924 F.3d at 69] (quotation omitted)).  To satisfy the "wrongful means" element of the second prong, a plaintiff must show "'as a general rule,' that 'the defendant's conduct ... amount[ed] to a crime or an independent tort[.]'" See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015) (quoting Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004)).

Here, as set forth in the complaint and the sworn declarations in support of this motion, Plaintiff will easily prevail on its tortious interference claims.

Plaintiff worked to build a substantial customer base for a niche market by separating itself from the competition.  Its founder has been in the business for approximately a decade, and safeguarded the customer information obtained by requiring its key employee to enter it into a CRM system.

Defendants decided it is more profitable to poach Plaintiff's key employee and to have him steal Plaintiff's CPI than continue to pay DermSource its fee, a percentage of the overall revenue of CityMed, and thus breached the parties' agreement not to make any material changes to its operations in order to cut DermSource out of its business.

Defendants were aware of the existence of Plaintiff's contracts with its customers, as well as Plaintiff's employment relationship with its key employee, and unlawfully lured the key employee away in order to avail itself of Plaintiff's confidential information and trade secrets. Defendants did so, as set forth in the complaint and accompanying declaration, by engaging in bribery and illegal wiretapping in order to succeed in their endeavors.

Without the information they learned from Plaintiff's key employee by and through bribery and illegal wiretapping, which they were contractually required not to poach and to otherwise misappropriate, Defendants would not know the necessary specific contact information and preferences of Plaintiff's customers, nor would Defendants know how much Plaintiff's customers paid DermSource in order to undercut the Plaintiff and remove it from its own business.

Defendants engaged in bribery of DermSource's key employee to achieve their goals, and then utilized that key employee's access to Plaintiff's camera system to listen in on internal conversations that principals of Plaintiff had before, during, and after their negotiations with Defendants, thereby satisfying the "wrongful means" element.

Defendants thus intentionally breached their agreement with DermSource not to make material changes in their operations by poaching their key employee and utilizing him to misappropriate Plaintiff's confidential information and trade secrets to prevent DermSource from serving the customers it has sourced and earning its contractual fees from CityMed.

As such, Plaintiff has demonstrated a likelihood of success on the merits on its claim for tortious interference.

### 7. Unjust enrichment

"To state a claim for unjust enrichment under New York law, a plaintiff must allege that: (1) the defendant benefited; (2) the benefit was at the expense of the plaintiff; and (3) that equity and good conscience require restitution." See Mazzaro de Abreu v. Bank of Am. Corp., 525 F. Supp. 2d 381, 397 (S.D.N.Y. 2007).

Here, Plaintiff has invested substantial time, money, and effort in developing and maintaining the CPI.

Through brazen acts of misappropriation, the Defendants have used and continue to use Plaintiff's CPI to unfairly compete with Plaintiff and to funnel Plaintiff's business opportunities away from Plaintiff to Defendants.

As a result of Defendants' use of Plaintiff's CPI, and theft of its customer information and key employee, Defendants have been enriched at Plaintiff's expense, by – among other things – receiving substantial revenues from the sale of dermatological pharmaceuticals based on Plaintiff's business concept and pricing models without paying Plaintiff any fees or bearing the expense and risk of developing the services, materials, and marketing plans necessary to achieve sales, and luring Plaintiff's customers away through the use of Plaintiff's confidential information obtained through bribery and illegal wiretapping.  Thus, equity and good conscience require restitution to the Plaintiff.   Accordingly, Plaintiff is likely to succeed on its unjust enrichment claim.

**8. Breach of contract**

Plaintiff will also prevail on its breach of contract claim.  The elements of a breach of contract claim include "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages."  See Harris v. Seward Park Hous. Corp., 79 A.D.3d 425 (1st Dept 2010).

Here, as set forth above, Plaintiff has adequately pled that it had a valid agreement with Defendants, under which it performed, and which Defendants breached by making a material change in its operations without Plaintiff's consent to poach Plaintiff's key employee and utilize DermSource's CPI to unfairly compete against it and soliciting and stealing DermSource's customers and employees, causing DermSource damages.

As such, Plaintiff is likely to succeed on its breach of contract claim.

**9. Conversion**

Plaintiff will similarly prevail on its conversion claim.

In New York, "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." See Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49–50 (2006); see also State of New York v. Seventh Regiment Fund, 98 N.Y.2d 249, 259 (2002).   The two elements of conversion are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." See Colavito, 8 N.Y.3d at 50 (citation omitted).

Here, there is no question that Defendants have obtained Plaintiff's CPI by violating their agreement with Plaintiff.  Thus, because Plaintiff has adequately shown that it has a possessory right and interest in its CPI, and that Defendants obtained the CPI in derogation of Plaintiff's rights to maintain the confidentiality thereof, DermSource will succeed on its conversion claim.

**10. Civil Conspiracy**

Plaintiff will also prevail on its civil conspiracy claim.  Although "New York does not recognize civil conspiracy to commit a tort . . . as an independent cause of action" … "a plaintiff may plead the existence of a conspiracy in order to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme." See Levin v. Kitsis, 82 A.D.3d 1051, 1052 (2d Dept 2011).  Here, as set forth above, Plaintiff has adequately pled that Defendants committed various torts – i.e., misappropriation, unfair competition, tortious interference, and unjust enrichment – as part of their common scheme to poach Plaintiff's key employee and unlawfully wiretap Plaintiff's offices to unfairly compete with DermSource.

26

As such, Plaintiff is likely to succeed on this claim, as it is likely to succeed on all of its claims against Defendants.

**11. Breach of Implied Covenant of Good Faith and Fair Dealing**

Plaintiff will also prevail on its breach of implied covenant of good faith and fair dealing claim. Under New York law, "a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance." See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007). This implied covenant of good faith and fair dealing "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included." See 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153-54 (N.Y. 2002) (citation omitted). This includes a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 500 (citation omitted).

Here, Defendants pretended to negotiate a renewal of their contract with Plaintiff while surreptitiously poaching its key employee and eavesdropping on Plaintiff's internal communications concerning their negotiations with Defendants in an effort to destroy DermSource.

Accordingly, because Defendants have undoubtedly acted in bad faith and have engaged in unfair dealing with DermSource, Plaintiff is likely to succeed on its claim for breach of the implied covenant of good faith and fair dealing.

**C. The Balance of Hardships Tips Considerably In DermSource's Favor.**

DermSource's legitimate interest in protecting against Defendants' exploitation of its CPI and its long-standing relationships and goodwill with its customers certainly outweighs Defendants' minimal interest in misappropriating the CPI so that it can cut Plaintiff out of its business, or do business at all, given that Defendants have engaged in such heinous conduct.

27

As discussed *supra*, DermSource has created and cultivated the relationships and goodwill with its customer base through its own efforts and with considerable expense, let alone the significant expenditures it undertook to raise its brand awareness.

Thus, it would be patently unfair to allow Defendants to violate the law in order to exploit and misappropriate DermSource's relationships and goodwill with its customer base by using its CPI to solicit its customers and employees.

On the other hand, granting the relief sought and precluding Defendants from using DermSource's CPI would merely foreclose Defendants from continuing to unlawfully and unfairly compete against DermSource.

Thus, while DermSource stands to lose significant valuable relationships and goodwill – not to mention its entire business, which was valued in excess of tens of millions of dollars – that was obtained through its own painstaking efforts, Defendants merely stand to lose the ability to use DermSource's CPI to continue running the business Defendants have essentially stolen from Plaintiff since its inception.

As such, any harm suffered by Defendants should the injunction be granted will be minimal at best; instead, the injunction will merely require Defendants to source customers by other means rather than continue violating the law with impunity.  Thus, any harm suffered by Defendants is "self-inflicted" by virtue of their decision to engage in theft of trade secrets.

### D. Granting an Injunction Would Not Harm The Public Interest.

Before ordering injunctive relief, the Court should also "ensure that the injunction does not cause harm to the public interest."  See SEC v. Citigroup Global Markets, Inc., 673 F.3d 158, 163 n.1 (2d Cir. 2012)).  There is no reason to believe that the relief sought would cause injury to the public.  The protection of Plaintiff's CPI does not, and will not, stifle market competition, cause any dislocation in the market, or impinge on the availability of dermatological pharmaceuticals.

Indeed, the general public remains free to utilize the services of DermSource and many other competitors providing pharmaceutical products.

The public interest is best served in this instance by the enforcement of the law and the cessation of Defendants from misappropriating Plaintiff's CPI in an effort to cause DermSource harm; after all, if they are capable of stealing from DermSource, what would stop them from inflicting damage upon anyone else, including their own customers.  See Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 897 (2d Cir. 2015).

Thus,  like the remaining factors, this factor favors injunctive relief in favor of DermSource.

## **CONCLUSION**

DermSource has demonstrated a likelihood of success on the merits of its claims against Defendants and that without an award of injunctive relief under Rule 65 and the DTSA, it would suffer immediate and  irreparable harm.

DermSource has no adequate remedy at law and is therefore entitled to a preliminary injunction  prohibiting Defendants from using DermSource's CPI, servicing DermSource's customers, hiring  DermSource's employees, and shutting down DermSource during the pendency of this action.

For these reasons and the reasons set forth herein, DermSource respectfully requests that this Court grant its Order to Show Cause for Preliminary Injunction and Temporary Restraining Order and issue further relief as is just, equitable, and proper.

Dated: Lake Success, New York
   January 16, 2023

Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

_____/s_____
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1395 (direct dial)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*
*DermSource, Inc.*