UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DERMSOURCE, INC.,

                       Plaintiff,

    -against-

CITYMEDRX, LLC, ROBERT ABAEV, and DAVID ABAEV,

                      Defendants.
------------------------------------------------------------------X

**Case No.: 2:23-cv-281**

**DECLARATION OF YURIY DAVYDOV IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, & PERMANENT INJUNCTION**

Yuriy Davydov declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am the sole shareholder, President, and Chief Executive Officer ("CEO") of DermSource, Inc. ("DermSource"), the Plaintiff in this case. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at the DermSource office in addition to information I have learned from customers, vendors, and other third parties concerning the Defendants and their conduct.

**2.** The above-entitled case is brought for the purpose of obtaining a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining the Defendants from continuing to unlawfully utilize DermSource's trade secrets and confidential and proprietary information. More specifically, this lawsuit is brought to enjoin Defendants from committing and continuing to engage in heinous conduct designed to cut DermSource out of and steal by poaching DermSource's key employee in violation of the parties' agreement that specifically prohibits any material changes in business operations without consent, and ***utilizing that employee to conduct illegal wiretaps of Plaintiff's offices and steal their confidential information and trade secrets from within*****!**

3. DermSource is a Group Purchasing Organization ("GPO") representing over eight hundred (800) independent retail pharmacies.

4. A GPO is an entity that helps healthcare providers — such as independent retail pharmacies — realize savings and efficiencies by aggregating purchasing volume and using that leverage to negotiate discounts with manufacturers, distributors and other vendors.

5. DermSource was duly incorporated in July 2018.

6. Since its incorporation, DermSource invested in, developed, created, and launched the first-to-market online purchasing platform exclusively dedicated to the purchase of discounted dermatological pharmaceutical products, serving retail pharmacies nationwide in a highly competitive field of wholesale distributors.

7. Prior thereto, in 2017, I founded a sales and marketing organization which placed special focus on the dermatology market, serving and maintaining relationships with all stakeholders in the pharmacy industry, including pharmacies, practitioners, wholesalers, and manufacturers.

8. Beginning with my acceptance into St. John's University in Jamaica, NY for my Doctorate of Pharmacy degree in 2006, I have been actively vested and dedicated to the pharmacy industry as a New York State licensed pharmacist from 2011 to the present. Most recently, in 2023, I obtained a registered pharmacist license in the State of Pennsylvania.

9. For over a decade, my team of employees and I have built and cultivated significant relationships in the dermatological pharmaceutical channels of distribution and, in 2018, I decided to launch a new business – DermSource – whose model serves as a group purchasing organization dedicated to discounted dermatology products available to independent retail pharmacies in the United States, with a mission to help independent pharmacies stay in business.

10. As a group purchasing organization, DermSource obtains – as customers – independent retail pharmacies and it utilizes wholesalers – such as Defendant CityMedRx, LLC ("CityMed") – to fulfill the needs of the independent retail pharmacies. DermSource collects a three percent (3%) origination fee on all orders procured from the customers it sources.

11. On top of sourcing dermatological pharmaceuticals at affordable pricing, DermSource distinguishes itself by the relationships it has built and the accompanying services it provides to its customers – independent retail pharmacies.

12. For example, DermSource offers its independent retail pharmacy customers advice on market trends, brand awareness, new product offerings, and profitability, in an effort to add to their bottom line.

13. Since launching and exhibiting DermSource at the National Community Pharmacists Association's annual event held in Boston in 2018, the DermSource brand represents and publicizes "truth in pricing"[1] and "purchase power" for the independent retail pharmacy – a brand that captured the attention of and engaged over eight hundred (800) independent pharmacies.

14. Based on my background and experience with pharmaceuticals, I spent significant time, effort, and resources to build DermSource as a brand, as is evidenced by numerous press releases issued over the years concerning DermSource, some of which were paid for as part of a brand awareness campaign, and several of which independently caught the attention of the press. See copies of press releases annexed hereto as Exhibits **"A"** through **"E."**

---

[1] Outside of the aggregation of their purchase power by and through DermSource, independent retail pharmacies stand to pay starkly different prices for the same dermatological pharmaceuticals because they do not have the same strength in numbers and purchasing power that DermSource has.

15. DermSource introduced an online group purchasing platform with highly discounted dermatology products and made it available to independent retail pharmacies. <u>See</u> copy of DermSource marketing materials explaining its business annexed hereto as **Exhibit "F."**

16. CityMed is a pharmaceutical wholesaler which had a vendor relationship with DermSource since DermSource's inception, until its recent unlawful conduct. Robert and David Abaev are CityMed's principals and/or members, and caused the conduct complained of herein.

17. DermSource utilizes a unique approach of retaining independent wholesalers, such as CityMed, that enables the opportunity to provide competitive pricing to its customers.

18. This unique show of "purchase power" enables independent pharmacies to compete in a highly competitive market dominated by conglomerate wholesalers.

19. DermSource incorporated the purchase power of many to acquire a fair price for the benefit of its customers and the public at large.

20. Since its inception, DermSource employed a single key employee who I personally educated, mentored, trained, and inspired in the field of pharmaceuticals, and who became instrumental in DermSource's growth to its customer base which, as of today, has approximately eight hundred (800) customers.

21. This key employee is Bahrum Siddiqui (hereinafter "Siddiqui").

22. Siddiqui initially started as an Operations Manager at DermSource.

23. Over time, however, I realized his full potential and admired his work ethic, which is a quality that I greatly respect in employees.

24. I took personal interest and care in working closely with Siddiqui to encourage and motivate him, literally inviting him to shadow my work and experience in the field of healthcare and, more so, the business of dermatology pharmaceuticals.

25. Siddiqui embraced my support and mentorship with open arms; he worked quickly and earned the title of Chief Operating Officer ("COO") at DermSource in June of 2019.

26. Siddiqui became the right hand to my position as the CEO at DermSource.

27. Prior to becoming employed by DermSource, Siddiqui had no relevant background or experience in the dermatology or pharmaceutical industry operations; he was merely a driver, delivering drugs for a pharmacy.

28. Before that, Siddiqui was an employee of the New York City Police Department for approximately three (3) years.

29. He therefore had no relevant knowledge or acumen in the highly specialized business of dermatological pharmaceuticals; his work ethic actualized the potential I saw in him.

30. Investing my time and energy, I trained Siddiqui in every single aspect of DermSource's business, including sales strategy for recruiting independent retail pharmacies to become customers, onboarding customers, business acumen, customer service skills, and administrative skills at DermSource. In fact, DermSource expended substantial resources in, for example, routinely flying Siddiqui out of the state to personally engage with local pharmacy owners and/or operators, attend and exhibit in relevant trade shows, and to build brand awareness in, i.e., Pennsylvania, Massachusetts, Texas, Kentucky, Florida, and Virginia, among other States.

31. Since its inception, DermSource has utilized CityMed, among others, as a wholesaler to fulfill orders.

32. On January 7th, 2021, CityMed signed a Joint Marketing and Sale of Business agreement with DermSource. See copy of agreement annexed hereto as **Exhibit "G."**

33. Under this agreement, DermSource used its purchasing platform, DermSource.com, to submit purchase orders *exclusively* to CityMed to be filled on behalf of its member pharmacies, whereas prior thereto, CityMed was one of several vendors of DermSource.

34. DermSource and CityMed thus entered into an exclusive agreement to have CityMed fulfill *all* orders sourced by DermSource. This agreement was premised on a business concept of consolidating DermSource's and CityMed's collective services in order to present a first-to-market duo that, together, as a pharmaceutical wholesaler and dermatology-specialized-GPO, would be marketed and sold as a single enterprise.

35. In fact, DermSource and CityMed achieved a valuation of 0.75X revenue, which accumulated to approximately $24 million, for their combined businesses and were successful in marketing themselves to be bought by a conglomerate in the pharmaceutical industry.

36. Regrettably, we were unable to consummate the transaction with the conglomerate for reasons outside of our control. However, the foregoing anticipated sale was achieved in large part due to our agreement to work exclusively with each other, and to require the consent of each other prior to making any material change in the operations of our respective businesses.

37. Specifically, the agreement provides, in ¶ 6, titled "<u>Certain Acts Require Mutual Consent</u>," and specifically states: "During the term of this Agreement neither Party shall take any of the following actions without the consent of the other Party: … (c) any material change in the operations of the Business." <u>See</u> Exhibit G.

38. The foregoing aspects to our agreement equally protected both DermSource and CityMed. Specifically, DermSource was protected from having its entire business model fail, while CityMed benefitted from the influx of pharmaceutical orders DermSource originated, which DermSource provided exclusively to CityMed.

39. We thus intended to renew our agreement which, by its terms, expired on December 31, 2022, in order to attempt to find another buyer and complete a similar – or even better – transaction, following the earlier unsuccessful bid to sell DermSource and CityMed.

40. I therefore met with Robert and David on December 5, 2022, at DermSource's headquarters in New Hyde Park, New York, to negotiate the terms of our anticipated renewed agreement, and did so with the understanding that – pending any such new agreement – we would continue to work together, in good faith, as we have throughout our relationship.

41. Notably, the Joint Marketing and Sale of Business agreement did not expire until December 31, 2022.  See Ex. G.

42. However, CityMed began to engage in bad faith bargaining during our negotiations and prior to the expiration of the Joint Marketing and Sale of Business agreement.

43. For example, during these negotiations, DermSource offered to increase shared revenue between the parties by introducing an additional wholesaler to service DermSource customers in the approximately sixteen (16) States that CityMed is not licensed in (and is thus unable to serve) that DermSource *could* service through other wholesalers, since CityMed is not licensed in those States, despite the fact DermSource could source customers in those States.

44. As a business partner, DermSource offered to CityMed in good faith fifty percent (50%) of any revenue generated from any sales to any such additional wholesaler; this proposal undeniably posed a win-win to both DermSource and CityMed.

45. However, CityMed not only rejected this proposal; Robert and David countered that they seek a $1-million liquidated damages provision for any violation of the exclusivity provision of their agreement with DermSource.

46. I was personally confused by CityMed's resistance to growing our respective businesses, which had a symbiotic relationship, and were contractually tied together, exclusively, for two years.

47. In addition, and as another example, in January 2021, pursuant to CityMed's agreement with DermSource, CityMed agreed to pay DermSource a three percent (3%) fee from CityMed's *overall* revenue – regardless of its source, i.e., procured by DermSource or not – in exchange for DermSource's commitment to appoint CityMed as their exclusive wholesaler which provided CityMed with all DermSource-customer-generated invoices and sales.

48. CityMed now sought to wriggle out of this financial arrangement even though DermSource was primarily and materially responsible for its explosive growth in revenue.

49. Indeed, DermSource is in possession of CityMed's annual tax returns and other financial metrics, year over year, and can substantiate this statement by identifying the customers it sourced and the revenue DermSource customers brought to CityMed.

50. Notwithstanding, during the December 2022 negotiations, after working with DermSource's customers exclusively for two (2) years and benefitting from this exclusive relationship, CityMed puzzlingly proposed *reducing* DermSource's fees from a percentage of overall revenue to fees based solely on a percentage of sales sourced by DermSource's online platform. In effect, CityMed sought to remove any obligation to pay a fee to DermSource if a DermSource customer called CityMed directly to place an order, as opposed to through its platform.

51. I was personally baffled by these requested changes to our agreement, which sought to reap the benefit of an exclusive arrangement in perpetuity while paying for it for only two (2) years, with no upside to DermSource.

52. Then, in the midst of negotiations in December 2022, Siddiqui suddenly gave two (2) weeks' notice that he was leaving the employ of DermSource.

53. Siddiqui stated in his December 20, 2022, resignation notice that DermSource had his cooperation for any assistance needed with the transfer of his responsibilities during any transition period. See copy of email annexed hereto as **Exhibit "H."**

54. Siddiqui agreed to return all company property and information as he was required to, but he failed to provide significant information about DermSource customers sourced by and through his employment with DermSource; more specifically, my team and I later found out that Siddiqui failed to enter that information into the DermSource's customer relationship management ("CRM") sales system, which documents all communication and documentation with its customers.

55. Siddiqui was therefore requested to provide each pharmacy's individual point of contact and preferred method of communication, among other customer information.

56. This confidential information often consists of the customers' personal cell phone number, unlisted telephone number, and/or email address; information that is not readily available to the public.

57. Siddiqui had and obtained specific contact information that is not public, i.e., cellular phone numbers of the individual responsible for purchasing at the independent retail pharmacy customers, purchasing habits, customer preferences, and similar information. This information belongs to DermSource.

58. Moreover, and crucially, Siddiqui refused, despite due demand, to contact DermSource customers and inform them of the transition to ensure continuity together with a member of my team.

59. This was as troubling as it was antithetical to Siddiqui's promise of cooperation for a smooth transition. Indeed, in a foreboding email just a week after his resignation, on December 28, 2022, at 1:27 am, Siddiqui stated that he felt "uncomfortable" providing DermSource with its customer information and abruptly left his employ prior to the two (2) week period. See copy of email annexed hereto as **Exhibit "I."**

60. I attempted to call Siddiqui immediately upon receipt of his e-mail on the morning of December 28, 2022, but he refused to accept the call. I remained in a state of shock and disbelief that Siddiqui, someone who I have taught this business to and who I completely entrusted, individually, with all assets of DermSource, refused to complete the knowledge transfer.

61. Shortly thereafter, but prior to the official termination date of the Joint Marketing and Sale of Business agreement, CityMed – without warning – ceased fulfilling orders from DermSource, effectively cutting DermSource out of its business completely while continuing to service the customers DermSource sourced in breach of the agreement!

62. This (second) sudden blow to DermSource's operation was unanticipated, in violation of the agreement, and done with malice to hurt DermSource and put it out of business.

63. As a result of Defendants' breach and egregious bad faith, on Friday, December 30, 2022, DermSource was forced to notify its customer base of the prospect for interruptions to the smooth processing of orders through its platform while DermSource flurried to find a wholesaler to remain in business. See copy of notice to customers annexed hereto as **Exhibit "J."**

64. DermSource earlier announced that Siddiqui will be replaced by Greg Savino ("Savino"), who was tasked with personally calling DermSource's customers to introduce himself and continue the business relationship between DermSource and its customers. See copy of notice annexed hereto as **Exhibit "K."**

10

65. Notably, in that earlier announcement, like many before it, DermSource and CityMed had a combined letterhead to address DermSource's customers by way of their agreement to work exclusively with each other.

66. Defendants poached Siddiqui in violation of their agreement and engaged in this conduct to deprive DermSource of the contractually agreed-upon benefit it expected to receive from CityMedRx, alienate DermSource from its customers, and split the proceeds of their efforts between themselves, all in an effort to cut DermSource out of its business and destroy the brand I worked so hard for over half a decade to build into a multimillion-dollar-valued-company.

67. Our business model, customer lists, contact information and preferences, information related to our revenues and profit margins, and the related information Siddiqui obtained during his employment with us are confidential and proprietary, and took great costs and efforts to create, including years of developing relationships with customers.

68. My team and I went through painstaking efforts, time, and money – blood, sweat, and tears – to build our business to what it was.

69. I have spent the last five years marketing the services of DermSource and the last decade cultivating the relationships with contacts in the industry, many of whom were individuals I personally introduced to Siddiqui, to help build DermSource.

70. Moreover, Siddiqui learned our customers' preferences solely through his employment with DermSource.  Our carefully curated customer preferences and customer relations are vital to our business; possession of that information, which Defendants misappropriated by and through Siddiqui, provided us a unique competitive advantage in our industry, a competitive advantage we have been stripped of by the Defendants' unlawful acts.

71. We took reasonable measures to keep our confidential information secret, including restricting access of this information only to Siddiqui, our COO, and requiring him to enter this information in a secure CRM program protected by firewalls and related resources.

72. In addition, the DermSource office is secured with video surveillance, keyboard office entry (as our office is not open to the general public), and Siddiqui had his own private office with his computer password-protected. Indeed, the entire office computer network is protected by a firewall.

73. It gets worse. To add insult to injury, on January 2, 2023, I learned that Siddiqui was remotely listening in to conversations I had with my team concerning business strategy following CityMed's abrupt end to our agreement *and shared that information with Defendants*! Specifically, in the middle of a conversation I was having with a new vendor to replace CityMed, the principal of the new vendor remarked that he had just been offered a proposal by CityMed to buy him out of his business. See copy of audio recording annexed hereto as **Exhibit "L."**

74. I was shocked when I heard this because I know CityMed would never otherwise have any interest in purchasing another vendor, and specifically, the vendor DermSource retained to replace CityMed.

75. Then, during other conversations with the same new vendor, the principal once again remarked that he had just recently spoken with CityMed concerning the same subjects I was discussing with that vendor.

76. Suspecting that, somehow, conversations I have in the DermSource office are being listened to unbeknownst to me, I contacted my Information Technology team to investigate.

77. I learned that someone was remotely accessing DermSource's camera system, which records audio and video.

78.	I also learned that a specific Internet Protocol ("IP") address – 69.121.78.226 – was routinely used to access the camera system over the last several months, while Siddiqui was still employed by DermSource.  See copy of documents concerning the IP address annexed hereto as **Exhibit "M."** (first page showing IP address in camera system; second identifying owner of IP address through idiCore).[1]

79.	Another member of my team conducted a search based on this IP address and learned that it belonged to Samina A. Siddiqui, Siddiqui's mother, with whom he resides. Id. at 2.

80.	Moreover, the IP address is connected to 231 Covert Avenue in Floral Park, NY, where Siddiqui resides.  Id.

81.	It thus became clear that Siddiqui was not only illegally accessing DermSource's camera system without authorization, but providing all information he obtained from his unlawful wiretap to Defendants so that they may work against my efforts to keep DermSource in business. And, during the last few months that Siddiqui was employed by DermSource, he was working with CityMed to provide CityMed with access to DermSource's private conversations regarding its business.

82.	Indeed, the data logs from our camera system show that Siddiqui first illegally accessed the system on October 31, 2022, while he was employed, last accessed the system on January 2, 2023, after he resigned, and accessed the system a total of **2,677 times** in between those dates.  See copy of log with Siddiqui's IP address annexed hereto as **Exhibit "N."**  This access was done solely to aid his plot with CityMed to steal DermSource's business.

---

[1] See https://www.ididata.com/solutions/idicore/ (last visited January 14, 2023) ("Through proprietary linking technology, advanced systems architecture and a massive data repository, idiCORE provides actionable intelligence to support debt recovery, fraud detection and prevention, investigations, due diligence, identity verification, legislative compliance, and more").

83. The lengths to which the Defendants have gone to plot and destroy the DermSource brand, business, and reputation only speaks to the value of the DermSource customer and the value-add DermSource provided to CityMed's business. It is no wonder Defendants have gone to such great lengths to cut DermSource out and keep all the profits to themselves.

84. These great lengths include, for example, poaching Siddiqui, dropping DermSource without notice or honor a transitional period, attempting to obstruct the replacement of a new wholesaler, spying on DermSource's closed-door executive meetings, and deceitfully and intentionally misleading DermSource's customers.

85. As a recent example of this vile behavior, in November 2022, a customer of DermSource sought to purchase dermatological pharmaceuticals and DermSource processed the Order. See copy of email correspondence annexed hereto as **Exhibit "O."**

86. However, in late December 2022, after Siddiqui left, when Savino sought to process another order, the customer informed Savino that Siddiqui already fulfilled the order – obviously directly through CityMed – and to cancel the order with DermSource. See copy of email correspondence annexed hereto as **Exhibit "P."**

87. I respectfully request that this abominable conduct by Defendants be appropriately addressed by this Court.

88. Immediate injunctive relief is necessary to prevent Defendants from destroying the customer relationships and goodwill that I have spent a decade building, from stealing our customers, which Defendants obtained solely by poaching and/or bribing Siddiqui, using our trade secrets and confidential information, and causing further imminent and irreparable financial harm to DermSource, as Defendants have unquestionably set out to do.

89. In addition to securing the return of our misappropriated information back to us from Defendants and enjoining Defendants from engaging in any further illegal activity, it is essential that DermSource be permitted to forensically examine the Defendants' email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of Defendants' unlawful schemes to steal DermSource's customers and employees.

90. Based on CityMed's egregious conduct, it should also be shut down pending the outcome of this litigation.

91. I respectfully request that this Court grant the relief requested herein.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 16, 2023.

_____
Yuriy Davydov